**MELLON BANK (EAST) PSFS, NATIONAL ASSOCIATION**

v.

**Kenneth V. FARINO; Leslie Trinin; Robert Levitas; Eileen Michaels, Appellants.**

Nos. 91–1089, 91–1090, 91–1091.

United States Court of Appeals, Third Circuit.

Argued July 8, 1991.

Decided April 7, 1992.

1218

Mary Ellen Krober (Argued), Walter Weir, Jr., Patterson & Weir, Philadelphia, Pa., for appellees.

Howard J. Kaufman, Peter J. Weidman (Argued), Kaufman, Coren & Ress, Philadelphia, Pa., for appellants.

Before: STAPLETON, HUTCHINSON and ROSENN, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

These cases require us to consider the borders of personal jurisdiction and the permissible exercise of judicial power. Finding that the district court remained within the boundaries established by the Supreme Court, we will affirm.

## I.

Mellon Bank (East) PSFS ("Mellon"), a Pennsylvania based financial institution, filed complaints in these three, consolidated diversity actions in the United States District Court for the Eastern District of Pennsylvania alleging the breach of three guaranty and suretyship agreements. The defendants filed motions to dismiss the complaints for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure. The district court denied the motions to dismiss and later granted Mellon's motions for summary judgment. The defendants' only argument on appeal is that the district court lacked personal jurisdiction over them.

The defendants are limited partners in three Virginia limited partnerships. Defendants Robert A. Levitas, Leslie Trinin, and Eileen Michaels are residents of the State of New York. Defendant Kenneth V. Farino is a resident of the Commonwealth of Virginia and is also the president of three, related Virginia corporations that serve as the general partners of the limited partnerships.

The partnerships were created to purchase and develop real estate in Richmond, Virginia. In connection with this development, the partnerships, through a mortgage broker, approached Mellon for financing. In preliminary correspondence with Mellon's Washington, D.C. branch, the mortgage broker explained the nature of the real estate transactions that the partnerships hoped to finance and represented that the limited partners would personally guaranty any loans made to the partnerships.[1]

---

1. A letter from the defendants' mortgage broker to Mellon requesting that the bank consider financing the deal states:

 Copies of the four principal's financial statements are also enclosed. The combined net worth of the principal's is about $30 million. *All will endorse!*

 App. at 188 (emphasis in original). We can draw no conclusion from this language other than that the agent of the "principals" offered

In addition to the personal liability of the limited partners, the partnerships represented to Mellon that the talent and experience that each partner brought to the partnerships was fundamental to their success. According to the affidavit of Frederick Felter, a Mellon vice-president, Mellon was favorably disposed to make the loans because:

[T]he Bank was told that each of the defendants had particular skills and abilities which they would contribute toward the success of the projects. Farino, an attorney, was represented as having ability in the area of real estate development and property management. Levitas, a lawyer also, was to contribute expertise in real estate law and development. Trinin, senior vice president of Glick Construction Co., was expected to provide construction experience which would be helpful during the renovation and rehabilitation stages. Michaels, a vice president of Prudential Bache, was to provide investment advice and assistance.

App. at 193. Relying on these representations and the limited partners' personal financial information, which was sent to the bank in Pennsylvania, Mellon agreed to make three loans to the partnerships totalling over $4.2 million. Each of the loan documents, which were essentially identical, provided that the partnerships would make monthly interest payments over the term of the loan to Mellon in Pennsylvania and a balloon payment of principal at the same location when the term of the loan expired. The first two loans were due 18 months from their respective closing dates; the third, 12 months from its closing date. The closings on each of the loans took place in Richmond, Virginia with Mr. Farino executing the loan documents on behalf of the general partners. The limited partners executed the guaranty and suretyship agreements for these debts in each of their states of residence.

The terms of the notes provided that the partnerships were to make payments to Mellon Bank Center in Philadelphia, Pennsylvania. Each note also stated that, "[t]his note has been delivered in Pennsylvania," but also that "[t]his note is to be construed and enforced in all respects in accordance with the laws of the Commonwealth of Virginia." The guaranty and suretyship agreements also stated that Philadelphia was the mailing address of the bank and that any correspondence between the guarantors and Mellon, including payments if the partnerships defaulted, must be sent to the bank at that address in Pennsylvania.

On May 19, 1989, when the balloon payment on the first of the three loans was three months past due, Mellon granted an extension. On that same date, the balloon payment on the second loan was due. This due date was apparently also missed as Mellon granted an extension on the second loan in August, 1989. Mr. Farino and Mr. Levitas negotiated these extensions on behalf of the partnerships and the limited partners with Mellon personnel in Pennsylvania.

Despite Mellon's forbearance, the partnerships were again unable to make payment when the new due dates arrived. Mellon granted two additional extensions of the due date on the first loan and one additional extension on the second. The partners continued to forward updated personal financial information to Mellon in Pennsylvania to induce the bank to grant the extensions. The limited partners also attempted to restructure the debt through phone and mail contacts with Mellon in Pennsylvania. Despite these efforts, the partnerships defaulted on the first two loans when the balloon payments finally came due. The third loan was subject to a cross default provision, so Mellon called for payment from the guarantors on all three obligations. When the defendants failed to remit payment, Mellon brought these suits to collect.

To the extent that the district court made factual findings, a clearly erroneous standard of review applies. *North Penn Gas Co. v. Corning Natural Gas Corp.*, 897 F.2d 687, 688 (3d Cir.) (per curiam), *cert. denied*, —— U.S. ——, 111 S.Ct. 133, 112

their personal guaranties as an inducement to Mellon to make the loan.

L.Ed.2d 101 (1990). However, the district court's decision that it possessed personal jurisdiction over the defendants is an issue of law of which our review is plenary. *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 698 (3d Cir.1990).

## II.

### A.

■ Rule 4(e) of the Federal Rules of Civil Procedure[2] is the starting point of our analysis. The rule authorizes personal jurisdiction over non-resident defendants to the extent permissible under the law of the state where the district court sits. *Mesalic*, 897 F.2d at 698. The applicable Pennsylvania provision is 42 Pa.Cons.Stat.Ann. § 5322(b) (1981).[3] The Pennsylvania statute permits the courts of that state to exercise personal jurisdiction over nonresident defendants to the constitutional limits of the due process clause of the fourteenth amendment. *North Penn Gas*, 897 F.2d at 689–90; *Nissley v. JLG Indus., Inc.*, 306 Pa.Super. 557, 452 A.2d 865, 866 (1982). Therefore, the district court's exercise of personal jurisdiction over these defendants was proper as long as it did not violate due process.

■ The next logical step in the jurisdictional inquiry is to determine whether a defendant's contacts with the state are sufficient to support general personal jurisdiction. If a party is subject to the general jurisdiction of a state, that party can be called to answer any claim against her, regardless of whether the subject matter of the cause of action has any connection to the forum. In the current case, however, the parties agree and the facts bear out that the defendants do not have sufficient contacts with Pennsylvania to be subject to the general jurisdiction of the courts of the Commonwealth.

### B.

■ In the absence of general jurisdiction, permissible *in personam* jurisdiction is dependent upon the concept of specific personal jurisdiction. Specific jurisdiction arises when the plaintiff's "claim is related to or arises out of the defendant's contacts with the forum." *Dollar Sav. Bank v. First Sec. Bank*, 746 F.2d 208, 211 (3d Cir.1984). In such a case, the court may go forward if it is satisfied that the relationship among the defendant, the cause of action, and the forum falls within the "minimum contacts" framework first announced in *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and later refined by the abundant progeny of that landmark case.

These offspring have solidified and refined the due process inquiry such that we now know that, "it is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting business within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). We also are to take into account "the relationship among the forum, the defendant and the litigation," *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 2580, 53 L.Ed.2d 683 (1977), in order to determine whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."

---

**2.** Rule 4(e) provides in relevant part:

\* \* \* \* \* \*

Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons, or of a notice, or of an order in lieu of a summons upon a party not an inhabitant of or found within the state, or (2) for service upon or notice to such a party to appear and respond or defend in an action by reason of the attachment or garnishment or similar seizure of the party's property located within the state, service may in either case be made under the

circumstances and in the manner prescribed in the statute or rule.

**3.** Section 5322(b) provides:

[T]he jurisdiction of the tribunals of this Commonwealth shall extend to all persons who are not within the scope of section 5301 [relating to general jurisdiction] to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States.

*World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

Because this case involved contracts among interstate parties, we are primarily directed in our analysis by the Court's opinion in *Burger King Corporation v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). *Burger King* involved a franchise agreement between two partners who were residents of Michigan and the Florida-based Burger King Corporation. The contracts provided that Florida law would apply to the transaction and that the franchisees were to send all fees and notices regarding the franchise to Burger King's headquarters in Miami. Although the partners purchased their equipment from a Burger King division based in Miami, the day-to-day oversight of the Michigan franchise was conducted by employees in Burger King's Michigan district office.

In upholding the Florida district court's exercise of jurisdiction in *Burger King,* the Court reviewed its own jurisprudence in this area. The Court first noted that the minimum contacts inquiry is a "fair warning" requirement of due process which is satisfied "if the defendant has 'purposely directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Id.* at 472, 105 S.Ct. at 2182 (citations omitted). The Court then addressed the manner in which it had applied these concepts to contract claims in the past, saying:

> [W]ith respect to interstate contractual obligations, we have emphasized that parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" are subject to regulation and sanctions in the other State for the consequences of their activities.... [W]here individuals "purposely derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obli-

gations that have been voluntarily assumed.

*Id.* at 473–74, 105 S.Ct. at 2182–83 (citations omitted). Therefore, the Court went on to conclude that:

> [W]here the defendant "deliberately" has engaged in significant activity within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's law it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Id.* at 475–76, 105 S.Ct. at 2184 (citations omitted).

■ After deciding that a defendant has sufficient minimum contacts, the court may next inquire "whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id.* at 476, 105 S.Ct. at 2184 (quoting *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160). In this second prong of the analysis, the court may examine the "fairness factors" of *World–Wide Volkswagen.* These factors include: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184 (quoting *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. at 564) (internal quotations omitted). As the Court indicated in *Burger King,* however, this second tier of analysis is discretionary with the court. As discussed further below, the Court emphasized these additional factors "may" be considered "in appropriate cases." *Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184.

### III.

#### A.

■ With regard to the facts currently before us, we first address whether the

defendants' activities are such that the defendants had sufficient minimum contacts with Pennsylvania to justify the district court's assertion of jurisdiction. When a defendant raises the defense of the court's lack of personal jurisdiction, the burden falls upon the plaintiff to come forward with sufficient facts to establish that jurisdiction is proper. *Carteret Savings Bank v. Shushan*, 954 F.2d 141, 146 (3d Cir.1992). The plaintiff meets this burden and presents a prima facie case for the exercise of personal jurisdiction by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Provident Nat. Bank v. California Fed. Sav. & Loan Assoc.*, 819 F.2d 434 (3d Cir.1987) (citing *Gehling v. St. George's School of Medicine, Ltd.*, 773 F.2d 539 (3rd Cir.1985)).

 The fact that a non-resident has contracted with a resident of the forum state is not, by itself, sufficient to justify personal jurisdiction over the nonresident. The requisite contacts, however, may be supplied by the terms of the agreement, the place and character of prior negotiations, contemplated future consequences, or the course of dealings between the parties. *Burger King*, 471 U.S. at 479, 105 S.Ct. at 2185. Although this is a close case, we conclude that Mellon has satisfied its burden.

The defendants here purposefully availed themselves of the privilege of conducting business in the Commonwealth. They were all well aware, or should have been, that they were dealing with a Pennsylvania bank. The guaranty and suretyship agreements, which they all signed, and the notes that those guaranties backed indicated that Mellon was a Pennsylvania entity. Payments on the notes and on the guaranties, if necessary, and any other correspondence were to be sent to Mellon's Philadelphia address. The defendants also provided personal net worth documentation to Mellon, initially through the mortgage broker and then directly to the bank in Pennsylvania, in the hope that, first, someone in the Commonwealth would approve the financing that the partnerships sought, and later,

that Mellon would extend the due date of those obligations. Mellon did not approach the borrowers seeking to lend money nor did Mellon initially request the guaranties. It was the defendants who approached Mellon and through this contact established a business relationship with a Pennsylvania entity.

For some reason, be it the rate of interest offered by Mellon, the service that the bank provided, the availability of funds, or merely the whim of the investors, the limited partnerships chose to finance their business through Mellon. They clearly had the option to seek financing with a bank or banks in any number of other states. Yet, the defendants chose Mellon in Pennsylvania. While it is true that the initial contact with Mellon was through its branch in Washington, D.C., the parties subsequently negotiated and corresponded with Mellon in Pennsylvania. We conclude that the defendants "purposely directed" their activities toward a Pennsylvania resident and thereby availed themselves of the opportunity to do business there within the meaning of *Burger King.*

In addition, by asking Mellon to lend money and offering to guaranty that debt, the defendants deliberately "reach[ed] out beyond one state and create[d] continuing relationships and obligations with citizens of another state," *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950). Mellon initially granted the three loans between August 1987 and November 1988 with payments to continue through November 1989. The extensions, that the limited partners negotiated, stretched these obligations even further, into June 1990. During this time, the defendants remained liable as guarantors and sureties if the principal obligor ever failed to pay. The actions of the defendants, therefore, knowingly created continuing obligations with a citizen of Pennsylvania.

 The defendants argue that, in making the minimum contacts determination, we should ignore any contacts that they had with the Commonwealth after the loans went into default. As a result, we

should limit our examination to the pre-contract contacts that the defendants had with the Commonwealth, which are virtually nonexistent, and then to the contract itself, which provides only the barest of connections among the defendants and the Commonwealth. We decline so to limit the scope of our inquiry.

The Supreme Court precedent in this area commands that such an inquiry is not to be limited in such an arbitrary way. In making personal jurisdiction decisions, we must employ a "highly realistic" approach and are to take into account "prior negotiations and *contemplated future consequences*, along with the terms of the contract and the parties' *actual course of dealing.*" *Burger King*, 471 U.S. at 479, 105 S.Ct. at 2185 (emphasis added). We relied upon this language in *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696 (3d Cir. 1990), in reversing a district court's refusal to exercise jurisdiction over a Florida defendant.

In *Mesalic*, nearly all of the pre-contract negotiations and the execution of the contract itself took place in Florida between a New Jersey purchaser and a Florida manufacturer of luxury power boats. The buyer went to the manufacturer's Florida showroom to discuss the purchase. The sales contract was signed there. The boat was built in Florida and the buyer made several trips to that state to inspect the construction and to make progress payments. When the construction was finished, the buyer made yet another trip to Florida to test the boat and to make the final payment. Although there were apparently a few problems with the finished product, the buyer accepted the boat and requested that it be delivered to New Jersey. The manufacturer's agents delivered the boat to New Jersey and apparently made some repairs there. In the buyer's breach of contract suit against the manufacturer, we held that the district court should have exercised personal jurisdiction over the manufacturer based solely upon the manufacturer's post-contract, post-default contacts with the Garden State. We stated:

> While the contract between the parties may not have obligated Fiberfloat [the manufacturer] to deliver and repair the boat in New Jersey, nonetheless they did.... Under such circumstances, we must assess the contacts actually made. We are not narrowly confined to reviewing the contractual obligations of the parties, as suggested by the district court. Our focus is not on the rights of the parties under the contract, but instead our focus is on whether there were sufficient minimum contacts between Fiberfloat and New Jersey.

*Id.* at 700–01.

Applying this reasoning in the current case, we must take into account the defendants' contacts with the Commonwealth before, during, and *after* the dates the loans were made and the guaranties were executed. Therefore, we may not disregard the fact that the defendants in this case sought extensions of the loan obligations directly from Mellon in Pennsylvania and supplied additional personal financial information to Mellon in Pennsylvania in furtherance of that objective.

**[9–11]** The defendants also cite other cases where courts have found that guarantors of contractual obligations were not subject to a distant forum's jurisdiction. *See, e.g., Arkansas Rice Growers Coop. Ass'n v. Alchemy Indus., Inc.*, 797 F.2d 565 (8th Cir.1986); *Bond Leather Co. v. Q.T. Shoe Mfg. Co.*, 764 F.2d 928 (1985). Initially, we note that a court is required to make an independent factual assessment of a defendant's contacts with the forum when deciding whether it possesses jurisdiction over that defendant. Each case must be judged on its particular facts. *Burger King*, 471 U.S. at 485, 105 S.Ct. at 2189 ("We ... reject any talismanic jurisdictional formulas"); *Kulko v. Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978) ("[T]he 'minimum contacts' test ... is not susceptible of mechanical application; rather, the facts of each case must be weighed"). Therefore, citing cases where other courts found other defendants in similar circumstances to be subject to that court's jurisdiction may or may not be helpful. In other words, ques-

tions of personal jurisdiction do not lend themselves to categorical determinations. There are no general rules governing whether or not guarantors of contractual obligations fall within the constitutional power of the courts of a particular forum.

Nevertheless, this proposition does not mean that we must decide such cases in a vacuum, without the benefit of the wisdom and insight of other courts that have decided similar questions. Our conclusion is, in fact, bolstered by the holdings of other courts. In *National Can Corp. v. K Beverage Co.*, 674 F.2d 1134 (6th Cir.1982), the court wrestled with what it referred to as "a naked minimum contacts case." The defendant of interest for our purposes was a North Dakota resident and was the spouse of one of four shareholders in a Kentucky soft drink company. Before selling bottles to the company, the bottle supplier required that all the shareholders and their spouses execute personal guaranties for the debt. The court of appeals held, based solely on the personal guaranty and the "marital property" interest that the North Dakota spouse had in the company's stock, that the district court in Kentucky could constitutionally assert jurisdiction. This defendant had far fewer contacts with the forum state than those in the case *sub judice.* In addition to the personal guaranties here, the defendants also have a far broader range of pre- and post-contract contacts with Pennsylvania. Moreover, the defendants here stood to benefit directly from success of the limited partnerships, whereas in *National Can*, the defendant's benefit was merely through her marital interest in her spouse's stock. *See also Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.*, 792 F.2d 989, 994 (11th Cir.1986) (Mere mailing of payments is not enough for jurisdiction. But "[a] direct solicitation by a foreign defendant of the business of a forum resident has been held

to be 'purposeful availment' in cases where either a continuing relationship or some in-forum performance on the part of the plaintiff was contemplated.") [4]

The defendants rely heavily on the fact that they have no physical contact with or presence in the Commonwealth. They argue that, "the defendants are four individuals who have, quite literally, *no* contacts to Pennsylvania." Appellants' Brief at 5 (emphasis in original). Defendants go on to list all the physical contacts that they do not have with Pennsylvania, e.g., no residence, no office, no bank accounts, no telephone listing, no property in the Commonwealth. While it may be true that the defendants have no physical connection with the forum, that is not dispositive. When a defendant has received the benefits and protections of the forum's laws by engaging in business activities with a forum resident, the courts have "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184. It is true that physical presence in the forum state is a contact which figures into the analysis. Nevertheless, at least since the time of *International Shoe*, the physical presence of the defendant in the forum has not been regarded as a jurisdictional litmus test.

Defendants also construe this court's decision in *Dollar Savings Bank v. First Security Bank of Utah*, 746 F.2d 208 (3d Cir.1984) as requiring us to reverse the district court. We note initially that *Dollar Savings* was decided before *Burger King;* therefore, we rely primarily on the direction that the Supreme Court has given us in the interim. Nevertheless, *Dollar Savings* is distinguishable. There, a Utah bank, acting as trustee for a group of investors, negotiated a purchase money loan for equipment with the United States

---

**4.** Some courts, when faced with suits against guarantors in a distant forum, have found significance in the guarantor's financial stake in the enterprise that was the beneficiary of the guaranty. *See, e.g., Bond Leather Co. v. Q.T. Shoe Mfg. Co.*, 764 F.2d 928 (1st Cir.1985); *Marathon Metallic Building Co. v. Mountain Empire Constr. Co.*, 653 F.2d 921 (5th Cir.1981). Others

have looked to whether the guarantor was an active or passive investor. *See Arkansas Rice Growers Coop. Ass'n v. Alchemy Indus., Inc.*, 797 F.2d 565 (8th Cir.1986). We find it unnecessary to decide whether such factors should control and hold only that, on the record currently before us, the facts support the district court's exercise of jurisdiction.

Trust Company and Dollar Savings' law firm in New York. The money was disbursed by Dollar, a Pennsylvania bank, and the loan was secured by a security interest in the equipment held by the New York trustee. When the Utah bank defaulted, the trust company assigned the security interest to Dollar, who attempted to take possession of the collateral by filing suit in Pennsylvania. The Utah bank's only contact with Pennsylvania was making wire transfer payments to Dollar in Pittsburgh. It "never solicited business" of any kind in Pennsylvania. *Id.* at 210. We held that there were insufficient contacts for the court to assert jurisdiction.

The dealings between the defendants and Mellon in this case are far more substantial. Defendants here *did* directly solicit business in the Commonwealth. At various points in the relationship between Mellon and the defendants, each defendant dealt with Mellon directly and through the defendants' agent.[5] In addition, they supplied personal financial information and secured the debts not only with mortgages on the properties but with personal guaranties. In *Dollar Savings*, the defendant's only connection to the forum was the contract. But here the defendants had contacts with Pennsylvania both before and after the contract.

### B.

"Once the plaintiff has made out a prima facie case in favor of personal jurisdiction, the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Carteret Sav. Bank v. Shushan,* 954 F.2d at 150 (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185). We may "in appropriate cases" consider whether the exercise of jurisdiction comports with notions of "fair play and substantial justice." This undertaking involves an examination of factors listed in *World–Wide Volkswagen, see supra* at

1222. However, such analysis is unnecessary in this case. In the first place, it is apparent from the *Burger King* opinion that once the plaintiff has made a prima facie case for jurisdiction based upon minimum contacts, the burden falls upon the defendant to show that the assertion of jurisdiction is *unconstitutional.* This burden is met when the defendant demonstrates to the court that factors are present that make the exercise of jurisdiction unreasonable.

After holding in *Burger King* that the defendant had sufficient minimum contacts with Florida, the Court stated, "[n]or has Rudzewicz [the defendant] pointed to other factors that can be said persuasively to outweigh the considerations discussed above [minimum contacts] and to establish the *unconstitutionality* of Florida's assertion of jurisdiction." *Burger King,* 471 U.S. at 482, 105 S.Ct. at 2187 (emphasis in original); *see also id.* at 484 n. 26, 105 S.Ct. at 2188 n. 26. Other courts and commentators have concluded that this language places the burden squarely on the defendant to show that the assertion of jurisdiction would be improper. *See, e.g., Haisten v. Grass Valley Medical Reimbursement Fund,* 784 F.2d 1392, 1400–01 (9th Cir. 1986) (Once minimum contacts are established, the defendant must present "a compelling case that jurisdiction would be unreasonable."); 4 C. Wright & A. Miller, Federal Practice and Procedure § 1067 at 301–02 (1987) ("the burden of showing minimum contacts continues to lie with the plaintiff, but ... once a prima facie showing is made, it becomes the defendant's burden to convince the court that the assertion of jurisdiction would be unreasonable.")

The defendants in this case have limited their argument to whether they had sufficient minimum contacts with the Commonwealth. They make no mention in their brief of the other factors that the

---

5. Defendants also argue that the contacts of their agent with the forum state cannot be attributed to them. This argument has been roundly rejected. *See Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 419 (9th Cir.

1977); *Ganis Corp. v. Jackson,* 635 F.Supp. 311, 315 (D.Mass.1986), *aff'd,* 822 F.2d 194 (1st Cir. 1987). *See also Burger King,* 471 U.S. at 479 n. 22, 105 S.Ct. at 2186 n. 22.

Supreme Court has considered in determining whether a specific assertion of jurisdiction is unreasonable despite the existence of minimum contacts. Because the defendants bear the burden of showing the unreasonableness of an otherwise constitutional assertion of jurisdiction, and because they have failed to raise the issue in this court, we conclude that this is not an "appropriate case" in which to consider the other factors bearing on "fair play and substantial justice." [6]

## IV.

Based upon the above reasoning, the decision of the district court regarding personal jurisdiction will be affirmed. The defendants' appeal was limited to the issue of jurisdiction; they have not challenged the district court's entry of summary judgment against them. We, therefore, leave those judgments undisturbed.

---

**6.** We note, nevertheless, that Mellon did address this issue in its brief. Mellon observes that the inquiry into fair play and substantial justice can also make constitutional the assertion of jurisdiction on a lesser showing of minimum contacts than may otherwise be required. *Burger*

*King,* 471 U.S. at 477, 105 S.Ct. at 2184. While not necessary for our decision, we believe that Mellon is correct and that if anything, the additional factors to be considered under *World–Wide Volkswagen* militate in favor of the district court's jurisdiction rather than against it.