Margaret S. **TANNENBAUM, Robert K. Morrison, and Christopher Freeman, Plaintiffs,**

v.

Reint **BRINK, Martin Brink, and S.A. Club Orient, Defendants.**

No. Civ.A. 00–CV–3206.

United States District Court, E.D. Pennsylvania.

Nov. 7, 2000.

James S. Tupitza, Tupitza & Martinelli, West Chester, PA, for plaintiff.

John W. Nilon, Jr., Kassab, Archbold, Jackson & O'Brien, Media, PA, for defendant.

### *MEMORANDUM*

JOYNER, District Judge.

This is a fraud case brought by Plaintiffs Margaret Tannenbaum ("Tannenbaum"), Robert Morrison ("Morrison"), and Christopher Freeman ("Freeman") against Defendants Reint Brink ("Brink"), Martin Brink, and S.A. Club Orient ("Club Orient"). In their Complaint, Plaintiffs allege a common law fraud and a Racketeering Influenced Corrupt Organizations ("RICO") claim against Defendants. Presently before the Court are Defendants' Motions to Dismiss, in which they move to dismiss for lack of subject-matter jurisdiction, lack of personal jurisdiction, forum non conveniens, improper venue, and failure to state a claim upon which relief can be granted. For the reasons below, we will grant Defendants' Motions to Dismiss on the basis of forum non conveniens.

## BACKGROUND

This case arises from a dispute over the ownership rights in certain condominiums that compose Club Orient, a resort located in French St. Martin.[1] Defendants are the original developers and partial owners of Club Orient and are St. Martin residents. Plaintiffs are three individual owners of separate condominium units in Club Orient. To appreciate the contours of the parties' present dispute, a brief history of the development and ownership of Club Orient is necessary.

According to the Complaint, Brink owns or is affiliated with a construction company called SCI de la Baie Orientale ("SCI"). In 1979, SCI purchased the real estate on which Club Orient is now constructed. After the land purchase, Brink formed a second company known as S.A. Club Orient ("SACO"), which then developed, and later operated, Club Orient. Because the resort included condominiums, Brink also formed the Copropriete de Club Orient ("the Copro"), a condominium association required under French law. As St. Martin is a French territory, the above companies and the resort were all organized and operated under French law.

Plaintiffs contend that SACO attempted to enter into two separate "nine-year commercial leases" with SCI in 1983 and 1988. Apparently, under French law, this type of lease allows the lessee to renew the lease at will for an indefinite time period. As a consequence, the "lease" effectively transfers the lessor's ownership interest to the lessee, in substance if not in name. Thus, in this particular scenario, the leases would have given Brink—through SACO, the les-

---

1. The island of St. Martin is divided between the northern half, which is controlled by the French, and the southern half, which is controlled by the Dutch. This dispute involves solely the French side of the island.

see—full control over the property then-owned by SCI, the lessor. The parties' disagreement arises here over whether SCI did, in fact, still own all of the property when the leases were entered into.

Plaintiffs argue that before the 1983 and 1988 leases were executed, Brink sold several condominium units, including one to Morrison. Despite selling the units *prior* to execution of those leases, Brink recorded the leases as if they had been approved and properly formalized by the new owners and the Copro. Thereafter, Brink continued to operate as though the leases were in effect until 1992, when various owners began to voice their concerns about the legal propriety of the leases. Eventually, after negotiations between the unit owners and Brink, the leases (which, according to Plaintiffs, never legally existed) were canceled in August 1992. In place of the nine-year leases, the individual owners agreed to two-year cancelable management contracts between themselves and SACO.

Following the August 1992 agreement to replace the nine-year leases with two-year management contracts, Brink continued to sell Club Orient condominium units. At some point after August 1992, both Tannenbaum and Freeman purchased units at Club Orient. The purchase agreement signed by Plaintiffs contained express language that the nine-year leases were no longer in effect. Despite payment in full by Plaintiffs, Brink refused to record the deeds on grounds that there was a defect in his title. It is unclear from the pleadings and affidavits whether Plaintiffs were aware at that time that the deeds had not been recorded. Regardless, the state of affairs remained unchanged until 1995 when Club Orient was partially destroyed by a hurricane.

After the hurricane, Club Orient was not completely rebuilt and reopened until mid-1997. At that time, Martin Brink became involved in the resort's operation. Simultaneously with the resort's reopening, the Brinks began to reassert the validity of the 1983 and 1988 commercial leases. In addition, during the next several years, the Brinks began to operate portions of the resort without consultation from the Copro or unit owners. According to Plaintiffs, the Brinks' location on the island allowed them to circumvent French law and to violate prior agreements without the knowledge of the non-resident owners.

In February 1999, the Copro held its annual meeting during which the renewal of the current two-year management contract was to be negotiated. By this point in time, the Brinks no longer had a majority interest in the Copro because they had sold more than one-half of the condominium units. During the meeting, however, Brink claimed an allegedly improper proxy that allowed him to retake the majority and name himself chairman of the meeting. After doing so, Brink broke off negotiations for the two-year management contract and sought a vote on reinstating the nine-year commercial leases. Despite his efforts, Brink was not able to force a vote, and the 1999 meeting ended without resolution of the leases.

After the 1999 meeting ended, the Brinks began conspiring to reinstate the nine-year commercial leases through other means. To that end, the Brinks fraudulently modified the 1999 meeting's minutes to reflect that a vote approving the nine-year leases had taken place. The altered minutes were then mailed to Copro members, including the named Plaintiffs. Plaintiffs allege that, under French law, association members have a limited period of time to object to a meeting's minutes and that failure to object constitutes approval of the minutes. Because no such objection took place within the time period, the Brinks sent out notices that the commercial leases had been approved at the 1999 meeting.

Shortly after, disgruntled owners began to question the validity of the nine-year leases and their "approval" at the 1999 meeting. Later, at the 2000 Copro gener-

al meeting, the owners passed a resolution affirmatively stating that no vote on the nine-year leases was taken during the 1999 meeting. In the face of this resistance, Defendants filed several suits against individual condominium owners and the Copro in the French courts of St. Martin. In these suits, Defendants apparently claim that the 1983 and 1988 commercial leases were never terminated and that they were properly readopted in 1999. As a result, Defendants are petitioning the French court to force execution of the commercial leases. While still defending these ongoing suits in St. Martin, Plaintiffs filed this action in Philadelphia in June 2000.

## DISCUSSION

### I. *Jurisdiction*

#### A. *Subject-matter jurisdiction*

First, Defendants move to dismiss for lack of subject-matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). In response, Plaintiffs argue that diversity jurisdiction exists under 28 U.S.C. § 1332(a), as well as federal question jurisdiction under 28 U.S.C. § 1331.

As the opposing parties in this case hail from different countries, they are clearly diverse for purposes of § 1332. *See* § 1332(a)(2). However, § 1332 also requires an amount in controversy that "exceeds the sum or value of $75,000, exclusive of interest and costs ..." § 1332(a). Notwithstanding that clear requirement, Plaintiffs state in both their Complaint and Response that the amount in controversy for the instant case "exceeds $50,000." (Compl. at 3; Pltf.Resp. at 2). Obviously, this statement is insufficient to meet the amount in controversy requirement under § 1332.[2] As a result, Plaintiffs have not established diversity jurisdiction. However, Plaintiffs have also pleaded a federal RICO claim, which is sufficient to confer federal question jurisdiction over that claim and to allow us to exercise supple-

mental jurisdiction over the remaining common law fraud claim. *See* § 1331 (federal question jurisdiction); *see also* 28 U.S.C. § 1367(a) (supplemental jurisdiction). Accordingly, we will deny Defendants' Motions with respect to subject-matter jurisdiction.

#### B. *Personal jurisdiction*

Next, Defendants move to dismiss for lack of personal jurisdiction. Whether personal jurisdiction over an out-of-state defendant exists is a two-part inquiry. First, a court must determine whether the long-arm statute of the forum state would allow the courts of that state to exercise jurisdiction over the defendant. *See* Fed.R.Civ.P. 4(e)(1). If the forum state would allow jurisdiction, then the court must determine if exercising personal jurisdiction over the defendant would be consistent with the Constitution's Due Process Clause. *IMO Indus. v. Kiekert AG*, 155 F.3d 254, 259 (3d Cir.1998). Pennsylvania's long-arm statute authorizes the exercise of personal jurisdiction to the maximum extent allowed by the Constitution. *See* 42 Pa.C.S.A. § 5322(b); *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.*, 75 F.3d 147, 150 (3d Cir.1996). As a result, the Court need only analyze the second part of the inquiry: whether the exercise of personal jurisdiction would conform with the Due Process Clause.

There are two distinct bases upon which personal jurisdiction can be premised—general jurisdiction and specific jurisdiction. General jurisdiction exists when, regardless of where the particular events giving rise to the litigation occurred, the defendant has continuous and systematic contacts with the forum state. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 n. 9 & 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). In contrast, specific jurisdiction exists when the events giving rise to the action are

---

**2.** Congress increased § 1332's amount in controversy requirement from $50,000 to $75,000 in 1996. *See* Pub.L. 104–317, 110 Stat. 3850 (1996).

related to the forum state and the defendant has minimum contacts with the forum state. *Id.* at 414 n. 8, 104 S.Ct. 1868.

In this case, Plaintiffs do not argue that Defendants had continuous and systematic contacts with the forum state such that this Court could exercise general jurisdiction. Rather, Plaintiffs contend that "defendant aimed his tortious activity at this Commonwealth." (Pltf.Resp. at 4). Thus, Plaintiffs maintain that this Court may exercise specific personal jurisdiction over Defendants based on Defendants' contacts with the forum. We agree.

Recently, the United States Court of Appeals for the Third Circuit recounted the now-familiar two-part test for specific jurisdiction:

> First, the Plaintiff must show that the defendant has constitutionally sufficient "minimum contacts" with the forum. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Second, for jurisdiction to be exercised the court must determine, in its discretion, "that to do so would comport with 'traditional notions of fair play and substantial justice.' " *See Vetrotex,* 75 F.3d at 150–51 (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

*IMO Indus.,* 155 F.3d at 259.

■ In the instant case, Plaintiffs argue that the fraudulent minutes mailed by Defendant to Tannenbaum in Pennsylvania constituted a " 'fraud based' tort," which is sufficient to establish minimum contacts. It is well-established that directing tortious activity at a forum can be enough to establish minimum contacts for due process purposes. *See, e.g., Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984); *IMO Indus.,* 155 F.3d at 260–61. Because much of this litigation centers on the allegedly fraudulent 1999 Co-pro meeting minutes, and the role they played in propagating the larger fraud against Plaintiffs, the mailing of those minutes to Tannenbaum is sufficient to allow

exercise of specific jurisdiction over Defendants. *See Calder,* U.S. at 788–90; *Carteret Savings Bank, FA v. Shushan,* 954 F.2d 141, 146–47 (3d Cir.1992) ("clearly an allegedly tortious act committed within the forum state which causes injury to a resident of that state ... conforms with due process"); *Elbeco Inc. v. Estrella de Plato, Corp.,* 989 F.Supp. 669, 677 (E.D.Pa.1997) (finding minimum contacts where alleged misrepresentations were directed at Pennsylvania); *Feinberg, Inc. v. Central Asia Capital Corp.,* 936 F.Supp. 250, 257 (E.D.Pa.1996) (finding minimum contacts where alleged fraudulent facsimiles were directed at Pennsylvania).

■ Having found sufficient minimum contacts, we must now examine whether exercising personal jurisdiction over Defendants would offend traditional notions of "fair play and substantial justice." *See Burger King Corp.,* 471 U.S. at 477, 105 S.Ct. 2174. Defendants have the burden of persuasion on this issue and must demonstrate that asserting jurisdiction would be unconstitutional. *See Mellon Bank (East) PSFS v. Farino,* 960 F.2d 1217, 1226 (3d Cir.1992). To meet their burden, Defendants must show why jurisdiction is unreasonable in light of a number of factors articulated by the Supreme Court. *See Burger King Corp.,* 471 U.S. at 477, 105 S.Ct. 2174; *see also World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (listing factors such as burden on defendant, forum state's interests, and plaintiff's interests in obtaining convenient relief).

Here, Defendants fail to address the second part of personal jurisdiction test at all. As a result, they have clearly not met their burden. We note that, even if Defendants had proffered an argument, it does not appear that this is the type of "compelling case" that offends traditional notions of fair play and substantial justice. *See Burger King Corp.,* 471 U.S. at 477, 105 S.Ct. 2174. Accordingly, we find that

Plaintiffs have made a sufficient showing to allow this Court to exercise personal jurisdiction over Defendants.

## II. *Forum Non Conveniens*

 Next, Defendants argue that jurisdiction aside, this Court should dismiss this action for forum non conveniens. It is true that, even where a Court has jurisdiction over a given action, it may dismiss that action under the doctrine of forum non conveniens. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). There is, however, a strong presumption in favor of the plaintiff's choice of forum, and it will be disturbed only when that choice would be oppressive to the defendant or inappropriate for administrative or legal reasons. *Id.* at 240, 102 S.Ct. 252. A defendant moving to dismiss on forum non conveniens grounds has the "burden of persuasion as to all elements of the forum non conveniens analysis." *Lacey v. Cessna Aircraft Co.,* 862 F.2d 38, 43–44 (3d Cir. 1988) ("*Lacey I*"). To satisfy his burden, a defendant must show that: (1) an adequate alternative forum exists and (2) the public and private interest factors weigh heavily in favor of dismissal. *Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 180 (3d Cir. 1991) ("*Lacey II*"). We turn to these elements next.

### A. *Alternative Forum*

"The requirement of an adequate alternative forum is generally satisfied 'when the defendant is 'amenable to process' in the other jurisdiction.'" *Id.* (citing *Piper,* 454 U.S. at 254 n. 22, 102 S.Ct. 252). However, "if the alternative forum offers a clearly unsatisfactory remedy, it will nonetheless be inadequate." *Id.* Defendants are all citizens of French St. Martin, and it is undisputed that they are amenable to process there. In addition, there is no indication that the remedy available in the French courts is less than adequate. As a result, we find that Defendants have satisfied their burden for establishing an adequate alternative forum.

### B. *Interest Factors*

#### 1. *Private Interest Factors*

 In addition to establishing an adequate alternative forum, Defendants must also show that the private and public interest factors weigh heavily in favor of dismissal. The private interest factors to be considered are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of the unwilling; (3) the cost of obtaining attendance of the willing; (4) the possibility of view of the premises, if view would be appropriate; (5) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *Id.* (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)).

Addressing the first factor, the sources of proof in this case appear to be almost entirely in St. Martin. The controversy revolves around a resort located in St. Martin. The meeting minutes at issue were taken at a meeting held in St. Martin, and the minutes were later altered in St. Martin. Similarly, the contracts and leases underlying the alleged fraud were made in St. Martin and presumably the originals still reside there. Finally, the Defendants' sources of proof, including documents and witnesses, obviously are in St. Martin.

Turning to the second and third factors, the issues surrounding appearance of willing and unwilling witnesses also militate in favor of trial in St. Martin. Plaintiffs make much of the fact that their witnesses would be other condominium owners who are either American or European. (PltfResp. at 8; Tupitza Aff. at ¶ 6). However, it is unclear how this recommends having a trial in Philadelphia over St. Martin. Of the 58 owners of condominiums, only one other than Tannenbaum resides

in Pennsylvania.[3] The rest of the owners are spread out across the United States, Europe and the Caribbean. Assuming these witnesses would appear willingly, most, if not all, would require air travel to Philadelphia. Of course, if any of these witnesses were unwilling to appear, a Pennsylvania court could not compel them to do so.[4] In addition, there is no indication that any witness has a connection with this forum aside from Tannenbaum who lives in the Commonwealth.[5] Conversely, each owner, by definition, has a significant connection to St. Martin by virtue of owning a residence on the island. Moreover, as Plaintiffs' own exhibits suggest, air travel to St. Martin is not appreciably more difficult or expensive than air travel to Philadelphia from points around the globe. Finally, Defendants and their witnesses are already in St. Martin, thus making that forum significantly more convenient for them.

With respect to the fourth factor, Plaintiffs claim that viewing the premises is irrelevant in this matter because the case involves a harm that cannot be viewed. (Pltf.Resp. at 8). Although that may be true, the alleged fraud arises directly from conduct involving the resort located in, and commercial transactions that emanated from, French St. Martin. To the extent that viewing the premises may become necessary, it clearly weighs in favor of holding trial in St. Martin.

Finally, we discern no considerations that implicate the final catch-all factor. While we recognize that Plaintiffs may incur somewhat greater expense conducting a trial in St. Martin rather than in Philadelphia, there is no evidence that Plaintiffs' financial circumstances are so dire as to outweigh the other factors. *Compare Kristoff v. Otis Elevator Co.*, Civ.A. No. 96–4123, 1997 WL 67797, at *2, *4 (E.D.Pa. Feb.14, 1997) (rejecting financial hardship argument where Plaintiff had to save $2,500 within 3 months, and dismissing for forum non conveniens) *with McKrell v. Penta Hotels (France), S.A.*, 703 F.Supp. 13 (S.D.N.Y.1989) (finding that defendant's inconvenience of litigating in New York outweighed by financial hardship to plaintiff who had less than $50 cash and over $10,000 in medical bills). As we noted above, the other two named Plaintiffs will incur travel and related expenses to litigate in Philadelphia, just as they would in St. Martin. More significantly, Plaintiffs are already defending a substantially similar action in French St. Martin, which suggests that conducting this trial there would not be unduly burdensome. If anything, the related nature of the cases weighs in favor of holding the trial in St. Martin for purposes of administrative ease and reducing duplicative costs. Balancing all of the private interest factors, we find that they weigh heavily in favor of dismissal.

### 2. Public Interest Factors

■ The relevant public interest factors a court must consider are the: (1) administrative difficulties flowing from court congestion; (2) local interests in having localized controversies decided at home; (3) interest in having a trial of a diversity case in a forum that is home with the law that must govern the action; (4) avoidance of unnecessary problems in conflicts of laws or application of foreign law; and (5) unfairness of burdening citizens in an unrelated forum with jury duty. *Lacey II*, 932 F.2d at 180 (citing *Piper*, 454 U.S.

---

**3.** It appears from the homeowners list that this sole condominium unit is owned by the estate of a now-deceased individual, which suggests that this is an unlikely source for a witness. *See* Club Orient Homeowners address list at 6 (listing Estate of William Fogel as owner of Unit 54).

**4.** Under Fed.R.Civ.P. 45(b)(2), a subpoena compelling a witness to appear at trial may only be served within 100 miles of the courthouse where the trial is being held.

**5.** Indeed, even the other two named Plaintiffs are not Pennsylvania residents; Freeman and Morrison live in Toronto and Massachusetts respectively.

at 241 n. 6, 102 S.Ct. 252). In considering these factors, we find that Pennsylvania has no connection with this cause of action other than the fact that the fraudulent minutes were mailed to Tannenbaum at her Pennsylvania home.

The first public interest factor appears inapplicable as neither party asserts that court congestion has any bearing on this action. The second factor, however, weighs in favor of trial in French St. Martin. The entire controversy involves transactions and events occurring in St. Martin. While Tannenbaum is a Pennsylvania resident, no other named Plaintiff, Defendant, or potential witness has any connection beyond this lawsuit with Pennsylvania. The only commonality any of the parties have is their interest in Club Orient, and their property located there.

Likewise, application of the third, fourth and fifth factors to this case recommends trial in St. Martin. There is already litigation proceeding in the French courts in St. Martin between these parties. We recognize that this litigation does not address the fraud allegedly committed by Defendants. It is clear, however, that the litigation does involve the various commercial transactions that underlie the fraudulent scheme. More importantly, the disposition of this case requires an application of French law to, among other things, the operation and effect of the nine-year commercial leases and the two-year management contracts. In addition, French law controls the rules applicable to the Copro, and the corporate formalities necessary for a condominium association to function. French courts in St. Martin are clearly in a better position than this Court to evalu-

ate these legal issues. Moreover, the ongoing litigation in St. Martin suggests that the French courts, as well as being better versed in French law, are already familiar with many of the factual issues in this case. Finally, we see nothing to favor the burdening of citizens of the Eastern District of Pennsylvania with jury duty to help resolve a matter involving French laws, occurring in a French territory, and affecting almost exclusively non-residents of Pennsylvania.

Based on the above, we conclude that the public interest factors weigh heavily in favor of dismissal. As an adequate alternative forum exists in St. Martin, and the private and public interest factors are clearly in favor of a trial in St. Martin, we will grant Defendants' Motions to Dismiss on forum non conveniens grounds. *See Kristoff,* 1997 WL 67797 (dismissing for forum non conveniens).[6]

## CONCLUSION

For the foregoing reasons, we will grant Defendants' Motions to Dismiss for forum non conveniens and dismiss Plaintiffs' Complaint without prejudice.

---

**6.** As we will dismiss on forum non conveniens grounds, we need not address Defendants' motions to dismiss for improper venue and failure to state a claim. In addition, we note that Defendant Martin Brink filed a motion to dismiss on October 10, 2000, and Defendant S.A. Club Orient filed a motion to dismiss on October 25, 2000. The parties are represented by the same counsel, and these two mo-

tions are almost identical. Although we are uncertain why counsel chose to file the same motion twice, the attached Order disposes of both motions. Moreover, because our Order dismisses on the basis of forum non conveniens, it also effectively dismisses without prejudice the action against Defendant Reint Brink who was not named in the above motions.