

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-9-1998

# Pennzoil Prod v. Colelli & Assoc Inc.

Precedential or Non-Precedential:

Docket 97-3335

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Pennzoil Prod v. Colelli & Assoc Inc." (1998). *1998 Decisions.* Paper 153.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/153

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 9, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 97-3335 & 97-3344

PENNZOIL PRODUCTS COMPANY,

      Appellant,

v.

COLELLI & ASSOCIATES, INC.;
PYRAMID TREATING INC;
T.O.P. PRODUCTION & OILFIELD SERVICES INC.;
COLELLI OIL WELL SERVICES INC.;
CHEMICAL SOLVENTS, INC.

        PYRAMID TREATING INC.;
        T.O.P. PRODUCTION & OILFIELD
         SERVICES, INC.
        CHEMICAL SOLVENTS, INC.,

        Appellants in 97-3344

        PENNZOIL PRODUCTS COMPANY

        Appellant in 97-3335

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 95-cv-00229E)

Argued March 26, 1998

Before: MANSMANN, ROTH and MCKEE, Circuit Judges

(Opinion filed: July 9, 1998)

William M. Wycoff, Esquire
 (Argued)
Thorp, Reed & Armstrong
One Riverfront Center
Pittsburgh, PA 15222

 Attorney for Appellant

Timothy L. Kerwin, Esquire
 (Argued)
Davis & Young
101 Prospect Avenue, West
1700 Midland Building
Cleveland, OH 44115

 Attorney for Appellee
 Colelli & Associates, Inc.

Shawn P. Martin, Esquire
Colelli & Associates
1370 Ontario Avenue
2000 Standard Building
Cleveland, OH 44113

 Attorney for Appellee
 Colelli & Associates, Inc.

Theodore O. Struk, Esquire
Dickie, McCamey & Chilcote
Two PPG Place, Suite 400
Pittsburgh, PA 15222-5402

 Attorney for Pyramid Treating, Inc.

William W. Guthrie, Esquire
William W. Guthrie & Associates
416 Frick Building
Pittsburgh, PA 15219

 Attorney for T.O.P. Production &
 Oilfield Services, Inc.

2

Edward J. Cass, Esquire
Virginia L. Heidloff, Esquire
Gary L. Nicholson, Esquire
Gallagher, Sharp, Fulton & Norman
1501 Euclid Avenue
6th Floor Bulkley Building
Cleveland, OH 44115

 Attorneys for Colelli Oil Well
 Services, Inc.

Edwin Allen Young, Esquire
1225 One Oxford Centre
Pittsburgh, PA 15219

 Attorney for Chemical
 Solvents, Inc.

OPINION OF THE COURT

ROTH, Circuit Judge.

This appeal arises from a diversity action brought by Pennzoil Products Company ("Pennzoil") against, among others, Colelli & Associates, Inc. and Colelli Oil Well Services, Inc. (collectively "Colelli"). Colelli sold to crude oil producers in Ohio a solvent, which was designed to reduce the accumulation of wax in the shafts of oil wells. The oil producers sold the oil to refineries, one of which was Pennzoil's refinery in Pennsylvania. Pennzoil alleges that Colelli's solvent contained silicon and that the silicon-tainted oil caused damage to its refinery. The district court granted Colelli's motion to dismiss for lack of personal jurisdiction and certified its order for interlocutory appeal. Because we conclude that Pennsylvania's long-arm statute extends personal jurisdiction to Colelli and that the exercise of such jurisdiction complies with constitutional due process requirements, we will reverse and remand to the district court for further proceedings consistent with this opinion.

I.

Pennzoil is a Nevada corporation with its principal place of business in Texas. Pennzoil operates an oil refinery in

3

Rouseville, Pennsylvania, for which it purchases Penn grade and Corning grade crude oil from producers in Ohio. The two Colelli entities are Ohio corporations with principal places of business in Ohio. Colelli is in the oil well maintenance business. It sells chemicals to oil producers to clean residue from their wells. Unlike most of the crude oil produced in the United States, Penn grade and Corning grade crude oil from the Ohio oil fields contain high levels of paraffin (i.e., wax). The high wax content results in the gradual accumulation of wax in the shafts of oil wells. Wax build-up impedes oil flow and production. Colelli sold a paraffin solvent to Ohio oil producers which they injected into the oil wells to reduce the accumulation of wax. As a result, however, the solvent also mixed with the oil produced from those wells.

Approximately sixty percent of the Penn grade and Corning grade crude oil produced by the Ohio producers was sold and shipped to Pennsylvania refineries. One of these was Pennzoil's Rouseville refinery. The other was a refinery owned by Witco in Bradford, Pennsylvania. The remaining oil was sold to a refinery in West Virginia. Cam C. Colelli, who founded and runs Colelli, has stated in deposition that he knew his customers (the producers) would be shipping oil to Pennzoil's Rouseville refinery. In fact, in 1994 (prior to the events that underlie the present case), Pennzoil had complained of damage caused to its refinery by chlorides in Colelli solvents. Once the issue was brought to his attention, Cam Colelli worked with Pennzoil to alleviate the chloride problem. He sent samples of solvents to Pennzoil's laboratories for testing and attended a trade association seminar on the dangers of chlorides in crude oil solvents.

In September 1995, Pennzoil initiated a diversity action in the Western District of Pennsylvania against Colelli & Associates, alleging that the anti-paraffin solvent injected into the Ohio oil wells contained silicon and that the silicon damaged its Rouseville refinery. The complaint also named Pyramid Treating, Inc. ("Pyramid") and T.O.P. Production and Oilfield Services, Inc. ("T.O.P.") as defendants. In April 1996, Pennzoil amended its complaint to add Colelli Oil Well Services and Chemical Solvents, Inc. ("Chemical") as

4

defendants. Like Colelli, the other defendants are Ohio corporations with principal places of business in Ohio.

In August 1996, Colelli moved to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. On February 7, 1997, the district court granted Colelli's motion. Later that month, Pennzoil moved for modification of the February 7 order to permit an interlocutory appeal. Pyramid, T.O.P. and Chemical joined Pennzoil's motion. In May 1997, the district court granted Pennzoil's motion to permit the appeal. Subsequently, Pennzoil filed a petition for permission to appeal to this court, which was granted. Pyramid, T.O.P. and Chemical also filed a notice of appeal. The two appeals have been consolidated.

II.

Although the propriety of personal jurisdiction is in dispute, the district court clearly had subject-matter jurisdiction over this diversity action, pursuant to 28 U.S.C. S 1332(a). Furthermore, since its order dismissed some, but not all, of the defendants, the order was not final and appealable under 28 U.S.C. S 1291. Nonetheless, the district court did grant permission for an interlocutory appeal. Therefore, we have jurisdiction to hear this appeal pursuant to 28 U.S.C. S 1292(b).

To the extent that a district court makes factualfindings in determining personal jurisdiction, we review for clear error. Mellon Bank (East) PSFS, National Association v. Farino, 960 F.2d 1217, 1220 (3d Cir. 1992). However, a district court's decision that it possesses or lacks personal jurisdiction over certain defendants is an issue of law of which our review is plenary. Id. at 1221.

III.

There are specific analytical steps we must take in determining whether personal jurisdiction can be asserted over a nonresident defendant. Rule 4(e) of the Federal Rules of Civil Procedure is the starting point. This rule "authorizes personal jurisdiction over non-resident

defendants to the extent permissible under the law of the state where the district court sits." Farino, 960 F.2d at 1221 (citation omitted). The forum state in this case is Pennsylvania. That state's long-arm statute is codified at 42 Pa. Cons. Stat. Ann. S 5322.1 We have acknowledged that the statute permits Pennsylvania courts to exercise personal jurisdiction over nonresident defendants"to the constitutional limits of the [D]ue [P]rocess [C]lause of the [F]ourteenth [A]mendment." Farino, 960 F.2d at 1221 (citations omitted); see also Renner v. Lanard Toys Limited, 33 F.3d 277, 279 (3d Cir. 1994) (noting that "Pennsylvania's long-arm statute authorizes jurisdiction to the fullest extent permissible under the Constitution"). A district court's exercise of personal jurisdiction pursuant to Pennsylvania's long-arm statute is therefore valid as long as it is constitutional. Farino, 960 F.2d at 1221; see also Renner, 33 F.3d at 279 ("[T]his court's inquiry is solely whether the exercise of personal jurisdiction over the defendant would be constitutional.") (citation omitted).

Next, we must determine whether the defendant's contacts with the forum state are sufficient to support general personal jurisdiction. Farino, 960 F.2d at 1221. When a state has general jurisdiction over a party, that party can be haled into court in that state "regardless of whether the subject matter of the cause of action has any connection to the forum." Id. A nonresident's contacts with the forum must be "continuous and substantial" to establish general jurisdiction. Provident National Bank v. California Federal Savings & Loan Association, 819 F.2d 434, 437 (3d Cir. 1987) (citations omitted). However, no party in this case contends that there is a basis for general

_____

1. Two portions of Pennsylvania's long-arm statute are pertinent to this case. First, the statute contains a "tort out/harm in" provision which extends personal jurisdiction to anyone who "[c]aus[es] harm or tortious injury in th[e] Commonwealth by an act or omission outside th[e] Commonwealth." 42 Pa. Cons. Stat. Ann. 5322(a)(4). Second, section 5322(b) of the statute states that jurisdiction extends "to all persons who
are not within the scope of section 5301 [relating to general jurisdiction]
to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States."

6

jurisdiction in Pennsylvania –– so we are free to consider
solely whether the alternative form of personal jurisdiction
is present: specific personal jurisdiction. Specific
jurisdiction exists when the plaintiff's claim " `is related to
or arises out of the defendant's contacts with the forum.' "
Farino, 960 F.2d at 1221 (quoting Dollar Savings Bank v.
First Security Bank of Utah, N.A., 746 F.2d 208, 211 (3d
Cir. 1984)).

To make a finding of specific jurisdiction, a court
generally applies two standards, the first mandatory and
the second discretionary. These standards serve to ensure
that defendants receive due process as required by the
Fourteenth Amendment. First, a court must determine
whether the defendant had the minimum contacts with the
forum necessary for the defendant to have "reasonably
anticipate[d] being haled into court there." World–Wide
Volkswagen Corporation v. Woodson, 444 U.S. 286, 297
(1980) (citations omitted). Second, assuming minimum
contacts have been established, a court may inquire
whether "the assertion of personal jurisdiction would
comport with `fair play and substantial justice.' " Burger
King Corporation v. Rudzewicz, 471 U.S. 462, 476 (1985)
(quoting International Shoe Company v. Washington, 326
U.S. 310, 320 (1945)). Although the latter standard need
only be applied at a court's discretion, see Farino, 960 F.2d
at 1222 (citing Rudzewicz, 471 U.S. at 476–77), we have
generally chosen to engage in this second tier of analysis in
determining questions of personal jurisdiction. See, e.g.,
Mesalic v. Fiberfloat Corporation, 897 F.2d 696, 701–02 (3d
Cir. 1990) (considering notions of "fair play and substantial
justice" in deciding issue of personal jurisdiction).

A.

1.

We will first consider the application of Pennsylvania's
long-arm statute to Colelli. Pennzoil and its co-appellants
argue that the statute extends jurisdiction to Colelli under
its "tort out/harm in" provision. The statute provides that
personal jurisdiction extends to any person who "[c]aus[es]

7

harm or tortious injury in th[e] Commonwealth by an act or omission outside th[e] Commonwealth." 42 Pa. Cons. Stat. Ann. 5322(a)(4).2 Pennzoil contends that specific jurisdiction arises from the alleged tortious injury it suffered in Pennsylvania, which was caused by Colelli in Ohio. (Again, no party maintains that there is any basis for general jurisdiction.) The district court rejected this contention, concluding that section 5322(a)(4) only applies to intentional tortfeasors -- not reckless or negligent tortfeasors as Pennzoil argued. Pennzoil Products Company v. Colelli & Associates, Inc., 953 F. Supp. 669, 675 (W.D. Pa. 1997). There is no foundation for this conclusion. The statute does not contain the modifier "intentional" in its reference to out-of-state tortfeasors. The statute simply extends jurisdiction to anyone who causes harm or tortious injury, intentionally or not, in Pennsylvania through acts or omissions outside Pennsylvania. We find guidance on this point from the Supreme Court of Pennsylvania, which has interpreted the closely related provision of section 5322(a)(3) (which addresses tortfeasors who cause injury in the state by acts or omissions within the state) as extending jurisdiction regardless of "what kind of tort is alleged." Kubik v. Letteri, 614 A.2d 1110, 1113 n.4 (Pa. 1992) (citation omitted). If the type of tort is irrelevant when committed within the state, there could be little reason it would matter when committed outside the state.

One court of appeals has confronted this exact issue and reached the same conclusion. In Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253 (11th Cir. 1996), the court of appeals for the Eleventh Circuit had to determine whether Florida's long-arm statute extended jurisdiction to nonresident defendants who were being sued for negligent conduct outside of Florida which resulted in harm in Florida.

_____

2. We should be cognizant that section 5322(a) only sets forth "examples of sufficient contact" (e.g., transacting business within the state, committing a tort within the state, etc.). Dayhoff Inc. v. H.J. Heinz Company, 86 F.3d 1287, 1302 (3d Cir.), cert. denied, 117 S. Ct. 583 (1996). Since section 5322(b) "further expands the potential bases for jurisdiction" to the limits of the U.S. Constitution, id., the list of examples of sufficient contact in section 5322(a) cannot be considered exhaustive.

Although the language of Florida's long-arm statute was not identical to Pennsylvania's, the Robinson court interpreted it to "reach[ ] the situation where a foreign tortious act cause[s] injury in [the forum state]." 74 F.3d at 257 (internal quotation marks and citation omitted). The court then concluded that the long-arm statute could be used to assert jurisdiction against parties whose "negligence ha[d] allegedly caused damage . . . in Florida." Id. We find Robinson to be supportive of our conclusion that a "tort out/harm in" provision of a long-arm statute cannot be restricted to intentional tortfeasors if its plain language gives no indication that it should be so restricted. Thus, based on the plain language of section 5322(a)(4), as well as the reasoning of Kubik and Robinson, we conclude that the district court erred in ruling that Pennsylvania's "tort out/harm in" statute only extends to intentional tortfeasors.3

The only way Colelli could argue that section 5322(a)(4) does not apply is by arguing that Pennzoil did not suffer an injury in Pennsylvania because it is not a Pennsylvania corporation (i.e., the harm is only "felt" wherever the corporation is headquartered). That argument, however, would also be untenable because we already rejected it in Carty v. Beech Aircraft Corporation, 679 F.2d 1051 (3d Cir. 1982). In interpreting a long-arm statute very similar to section 5322(a)(4),4 we held that"when a commercial entity

_____

3. We acknowledge that, even if the "tort out/harm in" portion of Pennsylvania's long-arm statute did not extend to nonintentional tortfeasors, the statute could still potentially reach Colelli because it extends to the due-process limits of the Constitution. See Mellon Bank (East) PSFS, National Association v. Farino, 960 F.2d 1217, 1221 (3d Cir. 1992) (citations omitted); Renner v. Lanard Toys Limited, 33 F.3d 277, 279 (3d Cir. 1994). However, since the "tort out/harm in" provision describes the present situation so explicitly and since the district court partially based its ruling on an application of the "tort out/harm in" provision, we find it appropriate to consider the proper bounds of that provision in hearing this appeal.

4. The long-arm statute (which was enacted in the U.S. Virgin Islands) in Carty v. Beech Aircraft Corporation extended jurisdiction to anyone who had "caus(ed) tortious injury in th[e] territory by an act or omission outside th[e] territory and regularly . . . solicit[ed] business or engage[d]
in any other persistent course of conduct, or derive[d] substantial

sues for tortious injury to its physical property, the `injury'
takes place for jurisdictional purposes where the property
has been damaged." Id. at 1065. Since Pennzoil claims to
have suffered damage to its refinery equipment in
Pennsylvania, that is where -- for jurisdictional purposes --
we must conclude the alleged injury occurred.

For the foregoing reasons, we conclude that
Pennsylvania's long-arm statute extends personal
jurisdiction to Colelli.

2.

Although we conclude that Pennsylvania's long-arm
statute extends jurisdiction to Colelli, we must still
determine whether the strictures of constitutional due
process (i.e., minimum contacts and notions of "fair play
and substantial justice") would be observed by asserting
jurisdiction.5 We cannot presume that jurisdiction is proper
simply because the requirements of a long-arm statute have
been met. Several courts of appeals have stressed this
point.

For example, in Sculptchair, Inc. v. Century Arts, Ltd., 94
F.3d 623 (11th Cir. 1996), the court of appeals for the
Eleventh Circuit had to determine whether Florida's long-
arm statute extended jurisdiction to several Canadian

_____

revenue from goods used or consumed or services rendered in th[e]
territory." 679 F.2d 1051, 1062 (3d Cir. 1982) (internal quotation marks,
citation and emphasis omitted). Thus, the statute in Carty was not as
far-reaching as the Pennsylvania statute but it operated under the same
principle of extending jurisdiction to foreign tortfeasors.

5. Since the "majority of states (and Puerto Rico) has enacted
jurisdictional statutes that have been interpreted to extend to the limits
of due process, [jurisdictional] analysis frequently is collapsed into a
one-step inquiry: does jurisdiction satisfy due process?" 4 Charles A.
Wright & Arthur R. Miller, Federal Practice and Procedure S 1069 (2d ed.
Supp. 1998). However, as noted earlier, Pennzoil's "tort out/harm in"
argument and the district court's rejection of that argument indicate that
we must consider both the proper application of Pennsylvania's long-arm
statute and the satisfaction of due process requirements -- not just the
latter. See supra note 3.

10

defendants. In rendering its decision, the Sculptchair court described this two-part analysis:

> First we must determine whether the Florida long-arm statute provides a basis for personal jurisdiction. If so, then we must determine whether sufficient minimum contacts exist between the defendants and the forum state so as to satisfy "traditional notions of fair play and substantial justice" under the Due Process Clause of the Fourteenth Amendment.

94 F.3d at 626 (quoting Robinson, 74 F.3d at 256). Thus, according to Sculptchair, a court must engage in due process analysis after it concludes that a state's long-arm statute extends jurisdiction to a defendant.

The court of appeals for the Sixth Circuit expressed the same understanding of due process in Nationwide Mutual Insurance Company v. Tryg International Insurance Company, Ltd., 91 F.3d 790 (6th Cir. 1996). In a case involving the application of Ohio's long-arm statute to a Danish corporate defendant, the Nationwide Mutual court concluded that "[a] valid assertion of personal jurisdiction must satisfy both the state long-arm statute, and constitutional due process." 91 F.3d at 793 (quoting Reynolds v. International Amateur Athletic Federation, 23 F.3d 1110, 1115 (6th Cir.), cert. denied, 513 U.S. 962 (1994)) (emphasis added). Similarly, the court of appeals for the Eighth Circuit has stated, "The federal court in a diversity case must determine whether [a] defendant is subject to the court's jurisdiction under the state's long-arm statute, and if so, whether exercise of that jurisdiction comports with due process." Moog World Trade Corporation v. Bancomer, S.A., 90 F.3d 1382, 1384 (8th Cir. 1996) (applying Missouri's long-arm statute). See also Jobe v. ATR Marketing, Inc., 87 F.3d 751, 753 (5th Cir. 1996) (considering both state's long-arm statute and constitutional due process requirements); Metropolitan Life Insurance Company v. Robertson-Ceco Corporation, 84 F.3d 560, 567 (2d Cir.) (same), cert. denied, 117 S. Ct. 508 (1996); Viam Corporation v. Iowa Export-Import Trading Company, 84 F.3d 424, 427 (Fed. Cir. 1996) (same).

11

B.

1.

The issue of minimum contacts is rather fact-sensitive in that it turns on the "quality and nature of a defendant's activity [in relation to the forum state]." Max Daetwyler Corporation v. R. Meyer, 762 F.2d 290, 298 (3d Cir. 1985) (citation omitted); see also Farino, 960 F.2d at 1224-25 ("[Q]uestions of personal jurisdiction do not lend themselves to categorical determinations."). Nonetheless, despite the difficulty in formulating bright-line rules in this area, some basic precepts have evolved in the assessment of minimum contacts. For example, if a nonresident defendant's contact with the forum is simply "fortuitous" or "the result of a single transaction," Max Daetwyler, 762 F.2d at 295, the minimum-contacts requirement has not been satisfied. Furthermore, with regard to producers or sellers of goods, "the mere foreseeability that a product one sells may end up in the forum state" does not render the seller amenable to suit in the forum state. Renner, 33 F.3d at 279 (citing Woodson, 444 U.S. at 291, 295). A finding of minimum contacts demands the demonstration of " `some act by which the defendant purposely avail[ed] itself of the privilege of conducting business within the forum State, thus invoking the protection and benefits of its laws.' " Farino, 960 F.2d at 1221 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

In many products-liability cases (of which this case is a sort), the seller does not come in direct contact with the forum state but does so through intermediaries such as retailers or distributors. In response to this phenomenon, courts have developed the "stream of commerce" theory by which specific jurisdiction is asserted over a nonresident defendant which injected its goods, albeit indirectly, into the forum state and either "derived [a] substantial benefit from the forum state or had a reasonable expectation of [deriving a substantial benefit from it]." Max Daetwyler, 762 F.2d at 300. Clearly, the stream-of-commerce theory can appear somewhat abstruse without some definition of its key terms (e.g., When is a benefit "substantial"? When is an expectation "reasonable"?).

12

In Asahi Metal Industry Company, Ltd. v. Superior Court of California, Solano County, 480 U.S. 102 (1987), the Supreme Court attempted to elucidate the elements of jurisdiction based on the stream-of-commerce theory. Unfortunately, the Asahi Metal Court presented three different conceptions of purposeful availment through the stream of commerce, none of which was endorsed by a majority of the Court.[6] In Asahi Metal, a California plaintiff injured in a motorcycle accident in California filed a products liability suit in California against Cheng Shin, the Taiwan corporation that manufactured the motorcycle's tire tube, contending the tube was defective. Cheng Shin impleaded Asahi Metal Industry Company, Ltd., a Japanese corporation, seeking indemnification because Asahi had manufactured the valve assemblies for Cheng Shin's tire tubes. The plaintiff and Cheng Shin settled, leaving only the indemnity action between Cheng Shin and Asahi, which contested jurisdiction.

Asahi had not solicited any business in California and had no offices, agents or property there. It sold its tube assemblies to Cheng Shin in Taiwan and had no control over the distribution system that brought its components into products eventually sold in California. The California Supreme Court concluded that Asahi knew that some of the valve assemblies would be incorporated into tire tubes sold in California and benefited indirectly from the sale of products incorporating the components in California. On this basis, the California Supreme Court sustained jurisdiction over Asahi.

The Supreme Court reversed that ruling, as all the Justices agreed that the exercise of personal jurisdiction over Asahi was disconsonant with notions of "fair play and substantial justice." Renner, 33 F.3d at 281 (discussing Asahi Metal generally).[7] However, the Justices were divided on the level of minimum contacts necessary for a finding of

_____

6. The voting breakdown among the Justices was 4-4-1. See generally Asahi Metal Industry Company, Ltd. v. Superior Court of California, Solano County, 480 U.S. 102 (1987).

7. We synopsized the facts, as well as the various analytical frameworks, of Asahi Metal in Renner, 33 F.3d at 281-82.

jurisdiction under the stream-of-commerce theory. For this reason, the Court issued three different methods of analysis. Justice O'Connor, writing for a plurality of four, concluded that placement of a product in the stream of commerce must be accompanied by some "[a]dditional conduct of the defendant [that] may indicate an intent or purpose to serve the market in the forum State." Asahi Metal, 480 U.S. at 112. Justice O'Connor provided the following examples of such conduct: "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." Id.

Justice Brennan, writing for another plurality of four, disagreed that a finding of such "additional conduct" was necessary. Noting that the stream of commerce does not consist of "unpredictable currents or eddies," Justice Brennan stated that "[a]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." Id. at 117 (Brennan, J., concurring). This premise led him to conclude:

> A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward the State.

Id. (Brennan, J., concurring) (emphasis added).

Justice Stevens, the ninth vote, presented a third viewpoint in his concurring opinion (which was joined by Justices White and Blackmun, who also joined Justice Brennan's concurrence). First, Justice Stevens observed that the Court's disquisition on minimum contacts was superfluous since the reversal was based on concerns about "fair play and substantial justice." Id. at 121-22 (Stevens, J., concurring) (internal quotation marks and

14

citation omitted). Nonetheless, he felt compelled to voice his distaste for the belief that "an unwavering line can be drawn between `mere awareness' that a component will find its way into the forum State and `purposeful availment' of the forum's market." Id. at 122 (Stevens, J., concurring) (citation omitted). Justice Stevens posited, instead, that a determination of purposeful availment must be made considering the following factors: "the volume, the value, and the hazardous character of the components [placed in the stream of commerce]." Id. (Stevens, J., concurring). He even went so far as to offer a rough estimate of the type of volume that would suggest purposeful availment: "I would be inclined to conclude that a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years would constitute `purposeful availment' . . . ." Id. (Stevens, J., concurring). Justice Stevens departed from the formulations of the two plurality opinions because (1) he did not find Justice O'Connor's factor of "additional conduct" to be dispositive or even relevant and (2) he considered the extent of the benefit (e.g., in terms of value or volume) derived from the forum State, a factor irrelevant to Justice Brennan's analysis, to be highly dispositive.

Obviously, Asahi Metal does not erect any bright-line guideposts -- and that point is evidenced in the federal appellate court decisions that have come in its wake. Some courts of appeals have boldly adopted one of the conflicting conceptions of minimum contacts via the stream of commerce. Compare, e.g., Barone v. Rich Brothers Interstate Display Fireworks Company, 25 F.3d 610, 613-15 (8th Cir. 1994) (adopting a position consistent with that of Justice Brennan) and Ruston Gas Turbines, Inc. v. Donaldson Company, 9 F.3d 415, 420 (5th Cir. 1993) (same) with Boit v. Gar-Tec Products, Inc., 967 F.2d 671, 683 (1st Cir. 1992) (adopting a position consistent with that of Justice O'Connor) and Madara v. Hall, 916 F.2d 1510, 1519 (11th Cir. 1990) (same). Most courts of appeals, however, have avoided choosing one position over the other and have instead decided cases based on facts in the record. See, e.g., Beverly Hills Fan Company v. Royal Sovereign Corporation, 21 F.3d 1558, 1566 (Fed. Cir. 1994); Tobin v. Astra Pharmaceutical Products, Inc., 993 F.2d 528, 543 (6th

15

Cir. 1993); Vermeulen v. Renault, U.S.A., Inc. , 985 F.2d 1534, 1548 (11th Cir. 1993);8Shute v. Carnival Cruise Lines, 897 F.2d 377, 382 n.3 (9th Cir. 1990), rev'd on other grounds, 499 U.S. 585 (1991). In our most recent stream-of-commerce case, Renner, we too did not have occasion to choose between the O'Connor and Brennan positions because we concluded that the factual record had to be developed through further discovery. 33 F.3d at 283. Consequently, we remanded the case to the district court without adopting one position or the other on the issue of minimum contacts based on the stream-of-commerce theory.

2.

After making a determination with regard to minimum contacts, a court has the option of evaluating whether exercising jurisdiction comports with notions of "fair play and substantial justice." That is, even if a defendant has the requisite minimum contacts with the forum state, other factors may militate against exercising jurisdiction. These "fairness factors" include: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Rudzewicz, 471 U.S. at 477 (quoting Woodson, 444 U.S. at 292) (internal quotation marks omitted).

_____

8. The court of appeals for the Eleventh Circuit has manifested some ambivalence in this regard in that it has issued opinions both embracing Justice O'Connor's standard and declining to adopt either standard. Compare Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1548 (11th Cir. 1993) ("Because jurisdiction . . . over [the defendant] in this case . . . is consistent with due process under the more stringent `stream of commerce plus' analysis adopted by the [O'Connor] plurality, we need not determine which standard actually controls this case.") with Madara v. Hall, 916 F.2d 1510, 1519 (11th Cir. 1990) (concluding that exercise of jurisdiction must satisfy the stream-of-commerce test articulated by the O'Connor plurality).

16

As mentioned earlier, application of the "fair play and substantial justice" prong is left to a court's discretion. See Farino, 960 F.2d at 1222. Nonetheless, we typically apply this second tier of the analysis in resolving issues of personal jurisdiction. See, e.g., Mesalic, 897 F.2d at 701-02 (concluding that assertion of personal jurisdiction comported with notions of "fair play and substantial justice"). Moreover, we have referred to its application as mandatory, not discretionary. Id. at 701 ("Having determined that there were sufficient minimum contacts, we must determine whether the assertion of personal jurisdiction accords with notions of `fair play and substantial justice.' ") (citation omitted) (emphasis added). The very fact that the Supreme Court precedent most pertinent to this matter -- Asahi Metal-- was decided on this basis counsels its application to the present case. This final step (i.e., assessing the "fairness" of asserting jurisdiction) concludes a court's jurisdictional analysis.

C.

1.

We now turn to the issue of whether exercising jurisdiction over Colelli complies with the requirements of due process under the Constitution. Initially, we must determine whether Colelli had minimum contacts with Pennsylvania by selling solvents to Ohio oil producers. Three facts are pertinent to this determination: (1) approximately sixty percent of the Penn grade and Corning grade crude oil produced by the Ohio oil producers was sold to Pennsylvania refineries; (2) Cam Colelli knew that oil produced by Colelli's Ohio customers was going to Pennzoil's refinery in Pennsylvania; and (3) in response to the 1994 chloride problem, Cam Colelli sent samples of Colelli solvents to laboratory personnel at Pennzoil's refinery to preclude future contamination problems.9

_____

9. Both Pennzoil and Colelli contend that a fourth fact is relevant: i.e., Cam Colelli admitted that he had some concerns that silicon in Colelli solvents could cause problems for some refineries. Pennzoil argues that

17

Keeping these facts in mind, we will apply the stream-of-commerce standards enunciated in Asahi Metal.

Looking first to Justice O'Connor's standard (which is more stringent than Justice Brennan's), the placement of a product in the stream of commerce must be accompanied by some "[a]dditional conduct of the defendant [that] may indicate an intent or purpose to serve the market in the forum State." Asahi Metal, 480 U.S. at 112. Justice O'Connor proffered the following as examples of such additional conduct: "[1] designing the product for the market in the forum State . . . [2] establishing channels for providing regular advice to customers in the forum State." Id. Colelli's actions clearly conformed to Justice O'Connor's definition of "additional conduct." Sending solvent samples to Pennzoil's laboratories demonstrated an intent to "design" a product which could be used to serve the Pennsylvania refinery market. Furthermore, the record indicates that Cam Colelli had a number of telephone conversations with lab personnel at Pennzoil's refinery to discuss testing procedures and methodology. Thus, Cam Colelli had established "channels for providing regular advice to" Pennzoil's personnel in Pennsylvania. Although Pennzoil was not technically a "customer" of Colelli's (since Colelli did not sell solvents directly to Pennzoil), Colelli was obviously motivated by the fact that Pennzoil operated one of the two major refineries in the state to which the Ohio producers sent sixty percent of their crude oil. Cam Colelli admits that he knew Pennzoil held such a significant portion of the Ohio producers' customer base;10 the

_____

the admission demonstrates knowledge of the dangers of silicon-tainted solvents. Colelli, on the other hand, argues that Cam Colelli only thought that silicon could be problematic because it acts as an anti-foaming agent, and not because he was aware of any potential for serious damage. Both of these arguments are irrelevant to our analysis because they address the merits of Pennzoil's claim, not the issue of jurisdiction.
Cam Colelli's beliefs about the potential degree of harm do not shed any light on where, no matter how slight or how severe, he thought that harm would occur.

10. When asked how he knew that the Ohio producers would send oil to Pennzoil's refinery, Cam Colelli responded, "The oil producers told me. There weren't that many refineries. Being that Pennzoil was the biggest, it was pretty obvious, in a sense." (Emphasis added.)

18

"additional conduct" of ensuring that the solvents met Pennzoil's requirements evinces a desire to satisfy that portion of the customer base. For these reasons, we conclude that Justice O'Connor's touchstone of additional conduct is present in this case. According to Justice O'Connor's standard, Colelli had the minimum contacts with Pennsylvania necessary for it to be haled into court in that state.

Next, we apply the standard articulated by Justice Brennan. This standard is even more clearly satisfied than Justice O'Connor's.11 Colelli has "placed goods [i.e., solvents] in the stream of commerce [and] benefit[ed] economically from the . . . sale of the final product[, i.e., crude oil, to refineries] in the forum State." Id. at 117 (Brennan, J., concurring). As such, Colelli "benefit[ed] from [Pennsylvania]'s laws that regulate and facilitate commercial activity." Id. (Brennan, J., concurring). According to Justice Brennan's standard, therefore, Colelli had the minimum contacts necessary for Pennsylvania to exercise jurisdiction.12

In summary, regardless of whether one applies the O'Connor standard or the Brennan standard, Colelli purposely availed itself of the laws of Pennsylvania by deriving financial benefits from its customers' sale of crude oil to Pennsylvania refineries. The Ohio producers sent

_____

11. One may note that, since Justice O'Connor's standard is more demanding than Justice Brennan's, any factual scenario that satisfies the former will probably satisfy the latter as well. Still, since we have not
manifested a preference for either of the two standards, the demands of clarity counsel us to apply both standards explicitly. The clear satisfaction of both the O'Connor and the Brennan standards obviates any need to adopt one over the other.

12. Although it is not essential to our analysis, we note that Colelli even
had minimum contacts under Justice Stevens' standard. The relative volume and value (two of the three factors central to Justice Stevens' position) of the silicon-laced oil forwarded to Pennsylvania is not in dispute: sixty percent of the crude oil generated by the Ohio producers found its way to Pennsylvania. Also, the "hazardous character" of the silicon (to property interests if not personal safety) is apparent from the
damage caused to Pennzoil's refinery. Asahi Metal, 480 U.S. at 122 (Stevens, J., concurring).

most of their oil to Pennsylvania; Colelli indirectly benefited from the sale to Pennsylvania refineries; Cam Colelli was aware of that indirect benefit; and Colelli had expressed a desire to preserve its relationship with at least one Pennsylvania refinery (Pennzoil's) by conforming its solvents to the refinery's specifications. For the reasons discussed above, these facts satisfy the criteria of both Justice O'Connor and Justice Brennan.13 We therefore conclude that Colelli did have the minimum contacts needed to support the exercise of personal jurisdiction in Pennsylvania.

2.

Finally, having determined that Colelli can be haled into court in Pennsylvania, we must determine whether such an exercise of jurisdiction would respect notions of "fair play and substantial justice." Justice Brennan noted that cases are "rare . . . in which minimum requirements in the concept of fair play and substantial justice . . . defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities." Id. at 116 (Brennan, J., concurring) (quoting Rudzewicz, 471 U.S. at 477–78) (internal quotation marks omitted). The present case is not one of those rare cases described by Justice Brennan.

None of the "fairness factors" -- the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the several states in furthering fundamental social policies -- suggest that exercising jurisdiction would be unreasonable in this case. "This is not a case where a severe burden is placed on an alien defendant as in Asahi[ Metal]. Nor does this case involve one isolated occurrence where the defendant had no connection with the forum state, as in [Woodson]." Mesalic,

_____

13. Since the facts of this case satisfy the standards of both Asahi Metal pluralities, we do not have occasion to select one standard or the other as the law of this circuit.

20

897 F.2d at 702. Colelli, which comprises two Ohio corporations, has been haled into district court in a state with which Ohio shares a border. Far from being isolated, Colelli's connection with the forum state has been bolstered by steady shipments of crude oil across that border. Furthermore, the suit was brought in the Western District of Pennsylvania, the district closest to Ohio. If we were to deem litigation in the Western District of Pennsylvania to be unreasonably onerous for Ohio defendants, we would create an unacceptable implication: i.e., that no foreign defendant could be haled into court in Pennsylvania -- because any burden borne by Ohio defendants would be the same for foreign defendants from other neighboring states and even greater for foreign defendants who are not domiciled in a neighboring state. Thus, we conclude that Colelli would not endure an unreasonable inconvenience by litigating this matter in Pennsylvania. See Interfirst Bank Clifton v. Fernandez, 844 F.2d 279, 285 (5th Cir.) ("The situation is unlike that in Asahi[ Metal], where the defendant, a Japanese corporation, would have had to travel to California and contend with a foreign legal system.[The defendant in this case] was asked only to travel to a neighboring state.") (citation omitted), amended on other grounds, 853 F.2d 292 (5th Cir. 1988).

When the district court declined to exercise jurisdiction over Colelli, Pennzoil refiled this action against Colelli in district court in Ohio. Considering the fact that several Ohio corporations are involved, one cannot deny Ohio's interest in this matter. Yet, Pennsylvania also has an interest in this dispute, since the only alleged harm occurred in Pennsylvania and relates to the oil industry -- an industry which is important for any state economy. Whatever the degree of Pennsylvania's interest in this matter, it cannot be considered any less than Ohio's. Finally, we cannot conceive of any judicial inefficiency or impairment of a substantive social policy that would result from exercising jurisdiction in Pennsylvania.

Indeed, Colelli itself does not even explain with any specificity how exercising jurisdiction would offend notions of "fair play and substantial justice." No claims of exorbitant travel expenses, unavailability of evidence,

21

drains on judicial resources or countervailing state interests have been made. Instead, Colelli merely argues that any exercise of jurisdiction without minimum contacts cannot comply with notions of "fair play and substantial justice." However, since we conclude that minimum contacts are present in this case, we reject this argument. Concomitantly, we conclude that exercising jurisdiction would be in accord with notions of "fair play and substantial justice."

IV.

To recapitulate, we conclude that Pennsylvania's long-arm statute properly extends personal jurisdiction to Colelli and that the exercise of such jurisdiction satisfies the requirements of constitutional due process. Accordingly, we will reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

22