**Joseph R. PORTELLA, et al.**

v.

**LIFE–TIME TRUCK PRODUCTS, INC., et al.**

v.

**Manning Enterprises, Inc., et al.**

**No. CIV. A. 00–876.**

United States District Court,
E.D. Pennsylvania.

Dec. 22, 2000.

---

654

Theodore A. Schwartz, Mark Mendel, Ltd., Philadelphia, PA, for plaintiffs.

Thomas P. Grace, Bodell, Bove, Grace & Van Horn, Philadelphia, PA, Chrystale B. Conwell, Bodell, Bove, Grace & Van Horn, Philadelphia, PA, for Life–Time Truck Products, Inc.

C. Scott Toomey, Cabaniss, Conroy & McDonald, LLP, Wayne, PA, for Ford Motor Co.

James J. Musial, Rawle & Henderson, LLP, Philadelphia, PA, for Bayshore Ford Truck Sales, Inc.

## MEMORANDUM

BARTLE, District Judge.

This is a products liability, negligence, and breach of warranty action. Defendant and third-party plaintiff Ford Motor Company ("Ford") has joined Manning Enterprises, Inc. and Manning Truck Modification, Inc. ("Manning") as third-party defendants.[1] Before the court is the motion of Manning Enterprises, Inc. and Manning Truck Modification, Inc. to dismiss Ford's complaint under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction.

### I.

Plaintiff Joseph Portella allegedly sustained injuries when a ladder attached to the side of the truck of his tractor-trailer broke after Portella stepped onto its second rung. The injury occurred during a temporary stop near a toll plaza in Plymouth Meeting, Pennsylvania. Guaranteed Overnight Delivery, Portella's employer, had custom ordered and purchased the truck from Bayshore Ford, a dealer located in New Castle, Delaware. Bayshore Ford in turn had ordered it from Ford which had manufactured the truck in its Louisville, Kentucky plant. Ford had contracted with Manning to install the allegedly defective ladder on this truck. The installation occurred in Manning's facility, also in Kentucky.

Manning provided and installed equipment on Ford's heavy and medium duty

---

1. Throughout this opinion, "Manning" refers to Manning Truck Modification, Inc. as distinct from Manning Enterprises, Inc. Before going out of business in 1996, Manning performed the work on the truck at issue in this case. Ford avers that Manning Enterprises, Inc. is the successor in interest or is otherwise responsible for the debts of Manning Truck Modification, Inc. Manning Enterprises, Inc. contends that Ford must articulate facts sufficient to demonstrate the alleged relationship between the Manning companies given its burden of establishing personal jurisdiction. Manning Enterprises, Inc. further asserts that Ford has failed to satisfy this duty and therefore has failed to show how Manning Enterprises, Inc. is connected to this case. Given our conclusion below, we need not finally determine the relationship between Manning Enterprises, Inc. and Manning Truck Modification, Inc.

trucks as required by work orders received exclusively from Ford. In addition to listing the specific equipment intended for each truck, the work order included the code, name, and address of the dealer who ordered the truck from Ford and the name and address of the customer who ordered the truck from the dealer. After modifying the truck as dictated by the work order, Manning would bill Ford and return the truck to Ford's nearby parking lot to await shipment. Ford would then deliver the truck to the dealer.

Manning did all of its business in Kentucky. It had no customers other than Ford, and it received work orders exclusively and directly from Ford. Manning did not advertise, produce product catalogs, or provide any other product information to dealers or other purchasers of Ford trucks. Manning never initiated contact with or directly delivered a vehicle to any Ford dealer or customer. Many of the dealers and purchasers of trucks built and sold by Ford and modified by Manning were Pennsylvania residents, a fact made known to Manning only because Ford's work orders included it, along with a lot of other information.

In this case, Ford contends that Manning purposefully placed its products and services into the "stream of commerce" with the knowledge that such products and services would reach Pennsylvania. Ford asserts that this court may exercise either general or specific in personam jurisdiction over Manning.

## II.

■ A federal district court may assert personal jurisdiction over a nonresident defendant to the extent authorized by the law of that state in which the action is brought, consistent with the demands of the Constitution. *See Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 436 (3d Cir.1987) (citing Fed.R.Civ.P. 4(e)). Pennsylvania law permits courts to "exercise personal jurisdiction over nonresidents to the constitu-

tional limits of the due process clause of the fourteenth amendment." *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino,* 960 F.2d 1217, 1221 (3d Cir.1992); 42 Pa. Cons.Stat. Ann. § 5322(b). Once a jurisdictional issue has been raised, the plaintiff bears the burden of establishing with reasonable particularity contacts sufficient to support the court's exercise of personal jurisdiction. *See Provident Nat'l Bank,* 819 F.2d at 437.

## III.

■ Ford asserts that Manning is subject to this courts' general personal jurisdiction. The exercise of general jurisdiction does not require that "the subject matter of the cause of action ha[ve] any connection to the forum." *Farino,* 960 F.2d at 1221. Rather, a court has general jurisdiction over a nonresident corporation only if the corporation's contacts with the forum are continuous, systematic, and substantial. *See Provident Nat'l Bank,* 819 F.2d at 437; 42 Pa. Cons.Stat. Ann. § 5301(a)(2)(iii). The standard for general jurisdiction "is not an easy one to meet." *Surgical Laser Technologies v. C.R. Bard, Inc.,* 921 F.Supp. 281, 284 (E.D.Pa.1996). In fact, only a showing of "significantly more than mere minimum contacts" will suffice. *See Provident Nat'l Bank,* 819 F.2d at 437.

It is undisputed that Manning did not do business in Pennsylvania. It had no customers, agents, distributors, offices, or employees in Pennsylvania. It did not advertise here. It never had any business contact or communication with residents of the Commonwealth. While many of the trucks which Manning modified as a result of its business dealing with Ford did end up in Pennsylvania, such contact cannot be said to have been continuous or systematic. The evidence does not demonstrate that any contacts with Pennsylvania were a substantial part of Manning's overall business operations. In sum, Ford has not established that Manning had the "extensive and pervasive" contacts with Penn-

**656**

sylvania necessary for general personal jurisdiction. *Reliance Steel Prods. Co. v. Watson, Ess, Marshall, & Enggas,* 675 F.2d 587, 589 (3d Cir.1982).

## IV.

Ford also contends that Manning is subject to specific personal jurisdiction within Pennsylvania. "Specific personal jurisdiction exists when the defendant has 'purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that "arise out of or related to" those activities.'" *BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254, 259 (3d Cir.2000) (quoting *Burger King,* 471 U.S. at 472, 105 S.Ct. 2174). For a court properly to exercise specific jurisdiction under the Due Process Clause, the plaintiff must satisfy a two-part test. *See IMO Industries, Inc. v. Kiekert AG,* 155 F.3d 254, 259 (3d Cir. 1998). First, the plaintiff must demonstrate that the defendant had the constitutionally sufficient "minimum contacts" with the forum. *Id.; see Burger King,* 471 U.S. at 474, 105 S.Ct. 2174. Second, the court, in its discretion, must determine that the exercise of specific jurisdiction is consistent with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *see Kiekert AG,* 155 F.3d at 259.

A defendant may be said to have established "minimum contacts" if there is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State," thus ensuring that "a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 299, 100 S.Ct. 559, 62

L.Ed.2d 490 (1980)). "[W]ith regard to producers or sellers of goods, 'the mere foreseeability that a product one sells may end up in the forum state' does not render the seller amenable to suit in the forum state." *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.,* 149 F.3d 197, 203 (3d Cir. 1998) (quoting *Renner v. Lanard Toys Ltd.,* 33 F.3d 277, 279 (3d Cir.1994)); *see Woodson,* 444 U.S. at 291, 295–96, 100 S.Ct. 559.

Ford seeks to base the exercise of specific jurisdiction on a "stream of commerce" theory. Such a theory provides for jurisdiction "over a nonresident defendant which injected its goods, albeit indirectly, into the forum state and either 'derived [a] substantial benefit from the forum state or had a reasonable expectation of [deriving a substantial benefit from it].'" *Id.* at 203 (quoting *Max Daetwyler Corp. v. R. Meyer,* 762 F.2d 290, 300 (3d Cir.1985)).

The Supreme Court specifically addressed the stream-of-commerce jurisdiction theory in *Asahi Metal Industry Company v. Superior Court of California, Solano County,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). In that case, Asahi Metal, a Japanese corporation, sold tire valve assemblies to a tire manufacturer in Taiwan. Eventually, tires with Asahi Metal's valves found their way into California where an alleged tire defect caused an accident. The accident victim sued the Taiwanese tire manufacturer in California state court, and the manufacturer impleaded Asahi Metal. The latter challenged the court's jurisdiction. Despite the fact that Asahi Metal did no business in California and had no control over the distribution system that brought its products into the forum state, the California Supreme Court upheld jurisdiction on the ground that Asahi Metal knew that its valve assemblies would be put in tires sold in California and benefitted indirectly from those sales.

The Supreme Court reversed. Its attempt to define the elements required for

specific jurisdiction under a stream-of-commerce theory, however, failed to produce a majority opinion. Writing for a plurality of four,[2] Justice O'Connor stated that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Asahi Metal*, 480 U.S. at 112, 107 S.Ct. 1026. Rather, some "additional conduct" indicating the defendant's "intent or purpose to serve the market in the forum State" is necessary before personal jurisdiction may be exercised. *Id.* Such additional conduct may include "designing the product for the [forum State's] market . . . ., advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* While not conclusively limiting "additional conduct" to the examples provided, Justice O'Connor clearly excluded "a defendant's awareness that the stream of commerce may or will sweep the product into the forum State." *Id.* Such knowledge simply "does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *Id.*

Justice Brennan, also writing for four justices,[3] disagreed with Justice O'Connor's "stream of commerce plus" theory. *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1548 (11th Cir.1993). He concluded that "jurisdiction premised on the placement of a product into the stream of commerce is consistent with the Due Process Clause, and [does not require] a showing of additional conduct." *Id.* at 117, 107 S.Ct. 1026 (Brennan, J., concurring in part and concurring in the judgment). In contrast to Justice O'Connor's view, Justice Brennan stated that as long as a defendant

"is aware that [its] final product is being marketed in the forum State," minimum contacts have been established. *Id.*

Justice Stevens, joined by Justices White and Blackmun,[4] believed that the constitutional determination of minimum contacts cannot assume an "unwavering line . . . between 'mere awareness' that a component will find its way into the forum State and 'purposeful availment' of the forum's market." *Id.* at 122, 107 S.Ct. 1026 (Stevens, J., concurring in part and concurring in the judgment). Rather, an evaluation of "the volume, the value, and the hazardous character" of the defendant's product is necessary to decide purposeful availment. *Id.*

*Pennzoil Products Company v. Colelli & Associates, Inc.*, 149 F.3d 197 (3d Cir.1998) is the most recent opinion of the Court of Appeals for the Third Circuit concerning the stream-of-commerce theory and the differing opinions of *Asahi Metal*. Colelli was an Ohio corporation which manufactured solvents used by oil producers to reduce the buildup of wax in the shafts of their oil wells. Colelli never sold its product to any Pennsylvania resident, but much of the oil produced by Colelli's customers was delivered to Pennzoil's refinery in western Pennsylvania. In a lawsuit in Pennsylvania federal court, Pennzoil alleged that Colelli's solvent contained chemicals which damaged its refinery. Colelli moved to dismiss the suit for lack of personal jurisdiction.

In addressing the applicability of the stream-of-commerce theory, the Court of Appeals declined to chose among any of the *Asahi Metal* standards. It found it unnecessary to do so because the requirements for the exercise of personal jurisdiction of all three tests were met. *Id.* at 206–7, 207 n. 12. Four facts influenced this

---

2. Chief Justice Rehnquist and Justices Powell and Scalia joined Justice O'Connor's interpretation of the stream-of-commerce theory.

3. Justices White, Marshall, and Blackmun joined Justice Brennan.

4. Justices White and Blackmun also joined Justice's Brennan's opinion.

determination. First, approximately sixty percent of the oil produced by Colelli's customers found its way into the Pennsylvania market. Second, Colelli knew that much of this oil was going specifically to Pennzoil's refinery. Third, "Colelli sent samples of [its] solvents to laboratory personnel at Pennzoil's refinery to preclude future contamination problems." *Id.,* 149 F.3d at 206. Finally, Colelli had numerous telephone conversations with Pennzoil's lab in order to discuss testing procedures and methodology. *Id.* The court concluded that these acts, taken together, satisfied "Justice O'Connor's touchstone of additional conduct" and "even more clearly satisfied" Justice Brennan's standard. *Id.,* 149 F.3d at 207. It also noted "that Colelli even had minimum contacts under Justice Stevens"' understanding of the stream-of-commerce theory. *Id.,* 149 F.3d at 207 n. 12.

Under the test enunciated by Justice O'Connor in *Asahi Metal,* we do not believe that this court can exercise personal jurisdiction over Manning. Like Colelli, Manning never directly sold its products or services in Pennsylvania. As noted above, Manning had no customers other than Ford and had no other business contacts with Pennsylvania. Unlike Colelli, however, Manning's activity failed to meet any of the examples of "additional conduct." *Asahi Metal,* 480 U.S. at 112, 107 S.Ct. 1026. First, Manning did not design products for the Pennsylvania market. *See id.; Colelli,* 149 F.3d at 206. It adhered instead to Ford's design for each truck as detailed in the work order. Manning also did not advertise its products or services in the Commonwealth. *See Asahi Metal,* 480 U.S. at 112, 107 S.Ct. 1026. Manning neither established channels to provide regular advice or product information to Pennsylvania consumers nor marketed its products through a Pennsylvania distributor or sales agent. *See id.; Colelli,* 149 F.3d at 206. Instead, Manning's entire and exclusive business relationship was with Ford and its Kentucky manufacturing plant. The products provided and services performed by Manning were ordered by Ford, delivered to Ford, and paid for by Ford in Kentucky. Ford's business relationships and commercial transactions, not Manning's, dictated where and to whom modified Ford trucks would be delivered.

Ford acknowledges that its Kentucky plant was Manning's only customer and that Manning never directly did business in Pennsylvania. It also concedes that "mere foreseeability" that a product might travel to the forum state is insufficient to establish minimum contacts with that state. *Colelli,* 149 F.3d at 203; *see Asahi Metal,* 480 U.S. at 112, 107 S.Ct. 1026; *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 296, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Ford contends, however, that it was more than foreseeable that the trucks modified by Manning would finds its way into the Commonwealth. In point of fact, Manning *knew*— months before hand—that Pennsylvania was the intended final destination of hundreds of trucks because the work orders indicated as much. According to Ford, this confirmed expectation must be distinguished from the mere foreseeability that the courts have rejected.

The distinction pressed by Ford between knowledge and foreseeability is unavailing. "[A] defendant's awareness that the stream of commerce ... will sweep the product into the forum State does not convert the mere act of placing the product into the stream" into minimum contacts acceptable under the Due Process Clause. *Asahi Metal,* 480 U.S. at 112, 107 S.Ct. 1026 (O'Connor, J., plurality opinion). Manning's knowledge that Ford had sold trucks to Pennsylvania residents does not demonstrate that Manning "purposefully avail[ed] itself of the privilege of conducting activities within" Pennsylvania. *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). In fact, the knowledge possessed by Manning upon which Ford now relies resulted from

Ford's unilateral decision to include dealer and customer information in its work orders. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The information was completely unnecessary for Manning to fulfill its contractual obligations to Ford. Furthermore, because the final destination of the modified trucks was decided by Ford and its customers long before Manning became involved in the process, Manning lacked any ability "to structure [its] primary conduct with some minimum assurance as to where that conduct [would and would not] render [it] liable to suit." *Woodson,* 444 U.S. at 297, 100 S.Ct. 559. Finally, awareness of the final delivery point of a truck did not in any way indicate Manning's *"intent or purpose* to serve the market of the forum State." *Asahi Metal,* 480 U.S. at 112, 107 S.Ct. 1026 (O'Connor, J., plurality opinion) (emphasis added).

Whatever contacts Manning may have had with Pennsylvania were "random, fortuitous, or attenuated." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (internal quotes omitted). Ford has simply failed to show that Manning maintained the constitutionally minimum contacts required by Justice O'Connor's stream-of-commerce analysis to permit a exercise of personal jurisdiction over Manning.

We acknowledge that the facts of this case might lead to a different result under the much broader stream-of-commerce standards enunciated by Justice Brennan or Justice Stevens in *Asahi Metal.* However, we believe that their approaches would render " 'foreseeability' alone … a sufficient benchmark for personal jurisdiction under the Due Process Clause." *Woodson,* 444 U.S. at 295, 100 S.Ct. 559. While modern advances and trends in technology have "substantially relaxed" the barriers imposed on state jurisdiction, the Supreme Court has "never accepted the proposition that state lines are irrelevant for jurisdictional purposes." *Id.* at 293, 100 S.Ct. 559; *see Denckla,* 357 U.S. at 250–251, 78 S.Ct. 1228; *McGee v. Int'l Life Ins Co.,* 355 U.S. 220, 222–23, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). The opinions of Justices Brennan and Stevens too closely approximate that very proposition. We believe that Justice O'Connor's stream-of-commerce analysis is the best-reasoned of the three opinions and the one which is likely to be adopted by the current Supreme Court.

Subjecting Manning to this court's personal jurisdiction would also offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). First, the burden on Manning would be significant. *See Asahi Metal,* 480 U.S. at 113, 107 S.Ct. 1026; *Woodson,* 444 U.S. at 292, 100 S.Ct. 559. The record in this case establishes that Manning was a company whose corporate activity was limited to the area of Louisville, Kentucky. Second, we are unconvinced that Pennsylvania has an articulable interest in adjudicating the dispute between Ford and Manning. *See id.* These two parties entered into their contractual relationship outside of the Commonwealth. While Ford contends that Pennsylvania law would apply to its claims, that has yet to be determined. We see no advantage to having a court in this forum apply what may be the laws of other states to a dispute between these corporations. In sum, Manning's contacts with Pennsylvania are so fortuitous and incidental that an exercise of personal jurisdiction would be unreasonable and unfair.

Accordingly, we will grant the motion of Manning Enterprises, Inc. and Manning Truck Modification, Inc. to dismiss Ford's complaint for lack of personal jurisdiction.