**DAVLYN MANUFACTURING CO., INC., Plaintiff,**

v.

**H&M AUTO PARTS, INC., d/b/a H&M Company Incorporated, Henry C. Hight, Jr., and Tape & Technologies Incorporated, Defendants.**

No. Civ.A. 04–5516.

United States District Court, E.D. Pennsylvania.

Aug. 18, 2005.

Gary Allen Rosen, Patrick Madamba, Jr., Law Offices of Gary A. Rosen, PC, Philadelphia, PA, for Plaintiff.

Richard M. Jordan, White and Williams, for Defendant.

### MEMORANDUM AND ORDER

JOYNER, District Judge.

Via the instant motion, Defendants Tape & Technologies, Incorporated and Henry C. Hight, Jr. seek, once again, to dismiss this patent infringement action for lack of personal jurisdiction. For the reasons that follow, Defendants' motion shall be granted and this action shall be dismissed with respect to the moving Defendants only.

### *Facts*

Plaintiff Davlyn Manufacturing Co., Inc. ("Davlyn"), a Pennsylvania corporation, is the assignee of three patents describing oven door gaskets used to seal the heat within conventional home ovens. Plaintiff filed the instant patent infringement action against Defendant H&M Auto Parts, Inc. ("H&M") on November 29, 2004, alleging that H&M's sale of oven door gaskets and clips to Electrolux Home Products ("Electrolux/Frigidaire"), the maker of Frigidaire brand appliances, infringed upon Plaintiff's patents. Plaintiff amended its Complaint on December 21, 2004, joining Defendants Tape & Technologies, Incorporated ("T & T") and Henry C. Hight, Jr ("Hight Jr.").

Defendant H&M is a Texas corporation headquartered in San Antonio, with additional offices in El Paso and Helotes. (Flack Depo., pp. 45, 47–50). H&M does business in Pennsylvania and does not contest this Court's jurisdiction. (Flack Depo., pp. 91–93). H&M was established in 1957 by Henry Hight, Sr. ("Hight Sr."), who is a current 60% shareholder. (Hight Aff. ¶ 4). The remaining seven shareholders, who all hold positions as officers and directors, are Hight Sr.'s children: Defendant Henry C. Hight, Jr., Robert Hight, Stephen Hight, Susannah Herman, Hallie Rowe, Joe Hight, and Nancy Flack. (Flack Depo., pp. 10–11; Pl. Exh. D; Hight Aff. ¶ 4).

During the time that they were employed at H&M, Defendant Hight Jr., a Vice President of H&M, and his wife, Sylvia Hight, a sales employee, developed an oven gasket for use in home ovens. (Flack Depo., pp. 65–67; Hight Aff. ¶ 11). In 2003, they arranged for a Chinese vendor to manufacture the allegedly infringing oven gaskets, and Hight Jr. made two sales on behalf of H&M. (Flack Depo., pp. 31–32, 64–65). In June of 2003, 11,000

gaskets were shipped to Electrolux/Frigidaire. (*Id.* at pp. 65, 82–84; Pl. Exh. O). In August of 2003, 3,000 gaskets were shipped to G.E. Roper Corporation ("GE"), the maker of General Electric brand appliances. (Flack Depo., pp. 65, 82–84; Pl. Exh. O).

Defendant H&M contends that, at some point prior to October 2003, Hight Sr. decided to discontinue the sale of oven gaskets, and instructed Hight Jr. and Sylvia Hight not to make any further sales or purchases of gaskets on behalf of H&M. (Flack Depo., pp. 30–37, 106–107, 114–115). Hight Sr. also allegedly told Hight Jr. and Sylvia Hight that "he wouldn't like" it if they purchased the gaskets on their own, independently of H&M. (*Id.* at p. 34). Nevertheless, Hight Jr. and Sylvia Hight made additional, allegedly unauthorized, purchases under the H&M name, and as well as at least one additional sale to Electrolux/Frigidaire, which was invoiced on December 19, 2003. (*Id.* at pp. 31–32, 74–78, 95; Pl. Exhs. P, R). H&M became aware of some of these purchases because the shipping and billing address used was that of H&M's Helotes office, where Hight Jr. and Sylvia Hight are headquartered. (Flack Depo., pp. 32–33; Pl. Exhs. P, R).

On January 16, 2004, H&M was notified by a letter from Plaintiff's counsel that its sale of oven gaskets potentially infringed upon Davlyn's patents. (Pl.Exh. Q). H&M did not respond to Plaintiff's correspondence until April 12, 2004, when Nancy Flack, President of H&M, wrote, "We understand that there are patent issues. After the receipt of your letter we discontinued all sales to Frigidaire on this item." (Pl.Exh. V).

Shortly after H&M's receipt of the January 16, 2004 letter from Plaintiff's counsel, Sylvia Hight sent the following e-mail from her H&M e-mail account to the Chinese manufacturer regarding a purchase order that had been placed on January 16, 2004: "We have been having many issues here regarding the patent and the potential lawsuit ... I'll need to forward the P.O. But because of the potential suit. I need to write and wire it another way ... I'll wire the money but I think I need to send it by another company name." (Pl. Exh. R). A subsequent email from Sylvia noted, "The company name that we are going to use is 'H&M' Tape & Technologies Company." (Pl.Exh. R). Thereafter, a purchase order dated January 30, 2004 was issued by "H&M Tape & Technologies" for 50,000 units from the Chinese manufacturer, for shipment to "H&M Tape & Technologies" at the address of H&M's Helotes office. (Pl.Exh. S).

Hight Jr. incorporated H&M Tape & Technologies Incorporated on February 4, 2004, and formally changed the company's name to Tape & Technologies Incorporated on April 5, 2004. (Pl.Exhs.F, G). The business address of T & T's registered agent, Hight Jr., is the same address as H&M's Helotes office. (Pl.Exh. G).

### Procedural History

Davlyn filed its Complaint against H&M on November 29, 2004 before the United States District Court for the Eastern District of Pennsylvania, unaware that the allegedly infringing gaskets were being sold by any other company. Defendant H&M was served with the Complaint on December 9, 2004, and Defendant Hight Jr. was notified of the suit at some point prior to December 13, 2004. (Flack Depo., pp. 91–93). Plaintiff first learned that another company was involved in the sale of the gaskets on December 21, 2004, by the following correspondence from H&M's counsel: "H&M made one small sale of the accused product to both Frigidaire and GE. However, once they received the cease and desist letter from your client, they made no further sales ... I have a copy of an email from Louise Wang at

Electrolux (Frigidaire) stating, 'this is to confirm that Tape & Technology was the supplier who was selling us the fiberglass door seal from Feb.04 to Oct.04.'" (Pl.Exh. Z). Upon receiving notice of T & T's involvement, Davlyn amended its Complaint on December 21, 2004, adding T & T and Hight Jr. as defendants. On January 5, 2005, Davlyn was served with a complaint in a declaratory judgment action that had been filed by T & T in the United States District Court for the Western District of Texas on December 16, 2004.

On January 10, 2005, Defendants T & T and Hight Jr. moved to dismiss this action for lack of personal jurisdiction, or in the alternative, to transfer the action to the United States District Court for the Western District of Texas. This Court denied the Motion without prejudice, and granted 60 days leave to conduct jurisdictional discovery.

On January 31, 2005, Plaintiff Davlyn moved before the United States District Court for the Western District of Texas to dismiss the action pending there, or in the alternative, to transfer venue to the Eastern District of Pennsylvania. Upon consideration of the record, the court found that T & T and Hight knew of the pending suit against H&M in the Eastern District and "clearly filed [the declaratory judgment action] in anticipation of litigation." *Tape & Technologies v. Davlyn Manufacturing Co., Inc.*, 2005 U.S. Dist LEXIS 8291 at 8, 2005 WL 1072169 at *3 (W.D.Tex.2005). While recognizing that the evidence "weigh[ed] against the exercise of the Court's discretion to hear the declaratory judgment action," the court denied the motion to dismiss only because "there exists some question as to whether the Eastern District of Pennsylvania would be able to exercise personal jurisdiction over Plaintiff." *Tape & Technologies*, 2005 U.S. Dist LEXIS 8291 at *10, 2005 WL 1072169 at *4.

Before this Court, Defendants T & T and Hight Jr. now renew their motion to dismiss or, in the alternative, to transfer.

### Standard of Review: Personal Jurisdiction

■ Questions of personal jurisdiction in patent actions are governed by Federal Circuit law, rather than that of the regional circuit in which the actions arise. *Akro Corp. v. Luker*, 45 F.3d 1541, 1543 (Fed. Cir.1995).

■ In order to establish personal jurisdiction in a patent infringement action over a non-resident defendant, a plaintiff must show both that jurisdiction exists under the forum state's long-arm statute, and that the exercise of jurisdiction would be consistent with the requirements of due process. *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1319 (Fed.Cir.2005). Of course, Pennsylvania's long-arm statute is coextensive with the limits of due process, extending jurisdiction to the "fullest extent allowed under the Constitution of the United States." *Resnick v. Manfredy*, 52 F.Supp.2d 462, 466 (E.D.Pa.1999).

In order to be subject to personal jurisdiction, due process requires that a non-resident defendant have certain "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *LSI Indus. v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir.2000) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The minimum contacts requirement helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum state. *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1565 (Fed.Cir.1994) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985);

*World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

Under the "minimum contacts" test, a defendant may be subject to personal jurisdiction under one of two theories. Where the defendant has maintained continuous and systematic contacts with the forum state, he will be subject to "general jurisdiction"; where, instead, the plaintiff's cause of action arises from the defendant's more limited forum-related activities, he may be subject to "specific jurisdiction." *LSI Indus.,* 232 F.3d at 1374–75 (citing *Burger King Corp.,* 471 U.S. at 472–73, 105 S.Ct. 2174; *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

■ The Federal Circuit has established a three-prong test for determining whether the exercise of specific jurisdiction is consistent with due process. Specific jurisdiction properly exists where: (1) the defendant "purposefully directed" its activities at residents of the forum state; (2) the claim arises out of or relates to those activities; and (3) the exercise of personal jurisdiction would be reasonable and fair. *3D Sys. v. Aarotech Lab.,* 160 F.3d 1373, 1378 (Fed.Cir.1998) (citing *Akro Corp.,* 45 F.3d at 1545–46). While the plaintiff bears the burden of establishing purposeful minimum contacts, upon this showing, defendants must prove that the exercise of jurisdiction is unreasonable. *Elecs. for Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1350 (Fed.Cir.2003) (citing *Inamed Corp. v. Kuzmak,* 249 F.3d 1356, 1360 (Fed.Cir.2001)). In deciding a motion to dismiss for lack of personal jurisdiction, the Court need not treat the plaintiff's allegations as true, but may consider affidavits and weigh any other relevant evidence in making the jurisdictional determination. *Atlantigas Corp. v. Nisource, Inc.,* 290 F.Supp.2d 34, 42 (D.D.C.2003).

## Discussion

### I. Specific Jurisdiction Under the Stream of Commerce Theory

■ Defendants T & T and Hight Jr. maintain that this action must be dismissed for lack of personal jurisdiction because neither T & T nor Hight Jr. purposefully directed the sale of allegedly infringing oven gaskets at the forum state of Pennsylvania.

Defendant T & T is a Texas corporation with no offices, employees, agents, or customers in Pennsylvania. (Hight Aff. ¶ 4, 8, 13). T & T's president, Defendant Hight Jr., is a Texas resident with no Pennsylvania business contacts. (*Id.* at ¶ 3, 14). T & T denies having ever sold, offered for sale, distributed, or advertised its products within Pennsylvania. (*Id.* at ¶ 13). Since its incorporation in February of 2004, T & T has sold oven gaskets and clips to only one customer, Electrolux/Frigidaire, located in Springfield, Tennessee. (*Id.* at ¶ 5).

Plaintiff, however, maintains that Defendants T & T and Hight Jr. purposefully directed their activities at the forum state of Pennsylvania by placing oven gaskets and clips in the stream of commerce via a nationwide distributor of home appliances. Electrolux/Frigidaire makes "Frigidaire" brand appliances, as well as residential ovens for Sears' "Kenmore" brand. (Flasher Aff. ¶ 4). Frigidaire and Kenmore brand products are sold through established channels of distribution throughout the United States, including in Pennsylvania. (*Id.* at ¶ 4). Electrolux/Frigidaire's website, for example, identifies 20 authorized retailers selling Frigidaire ovens in Pennsylvania within a 50 mile radius of Philadelphia, as well as seven authorized Frigidaire service providers in the same region through which replacement gaskets may be purchased. (Pl.Exh. CC). It is common knowledge that Frigidaire and Kenmore

brand appliances, including residential ovens, are widely available for sale throughout Pennsylvania. Gary Flasher, a project manager at Davlyn, was able to locate without difficulty at least two Frigidaire ovens being offered for sale locally which incorporated clip gaskets "of the exact style, materials, and other characteristics as the Accused Product." (Flasher Aff., ¶ 6–8). While T & T admits that Electrolux/Frigidaire is a manufacturer and distributor of ovens, and that Electrolux/Frigidaire incorporates T & T's gaskets and clips into ovens intended for sale, it asserts that "T & T has no control, nor knowledge except in a general sense, of the oven gaskets and clips' final destination." (Hight Aff. ¶ 9).

The Supreme Court in *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559 (1980) first addressed the question of whether constitutionally sufficient minimum contacts are satisfied where a defendant places a product in the "stream of commerce." The Court found that, where the sale of a product is not simply an isolated occurrence, but arises from the seller's attempts "to serve, directly or indirectly, the market for its product in other states," it is not unreasonable for a court to find that the seller has purposefully availed himself of the privilege of doing business in the forum state. *World–Wide Volkswagen Corp.*, 444 U.S. at 297, 100 S.Ct. 559. Thus, personal jurisdiction may properly be exercised over a corporation "that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *World–Wide Volkswagen Corp.*, 444 U.S. at 297–298, 100 S.Ct. 559. The Court did not, however, specify the degree of actual interaction that a seller must have with the forum state to demonstrate his intent or expectations with respect to serving a broader market.

In *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Supreme Court was evenly divided as to what would constitute sufficient minimum contacts under a stream of commerce theory. Justice O'Connor, writing for four members of the Court, found that the mere placement of a product into the stream of commerce, without more, does not demonstrate that a defendant "purposefully directed" his activities toward the forum state. *Asahi Metal Industry Co.*, 480 U.S. at 112, 107 S.Ct. 1026. Justice O'Connor proposed that, even if the defendant is aware that his product may be swept into the forum state, some additional evidence of purpose or intent must be found—for example, "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi Metal Industry Co.*, 480 U.S. at 112, 107 S.Ct. 1026. Justice Brennan and three others instead suggested that evidence of such "additional conduct" is not necessary for a finding of constitutionally sufficient minimum contacts. "The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Asahi Metal Industry Co.*, 480 U.S. at 117, 107 S.Ct. 1026. While maintaining the requirement that a defendant purposefully avail himself of business in the forum state, Justice Brennan found Justice O'Connor's "stream of commerce-plus" approach to be a "marked retreat" from the standard set forth in *World–Wide*

*Volkswagen. Asahi Metal Industry Co.,* 480 U.S. at 118–120, 107 S.Ct. 1026.

In light of the conflicting positions set forth in *Asahi,* the Federal Circuit has declined to adopt a position as to whether mere placement of a product in the stream of commerce and awareness of its potential destination will subject a defendant to jurisdiction in a forum state.[1] *Commissariat A L'Energie Atomique,* 395 F.3d at 1322 n. 7; *see also Beverly Hills Fan Co.,* 21 F.3d at 1566. In all the relevant cases addressed by the Federal Circuit to date, the defendants' contacts with the forum state have been sufficient to satisfy even the more stringent test set forth by Justice O'Connor in *Asahi.* In *Beverly Hills Fan Co.,* for example, the defendant, a ceiling fan manufacturer, shipped its fans directly to the forum state of Virginia for sale by a distributor with several retail outlets in Virginia. The fans ultimately sold in Virginia clearly identified the defendant as the source of the product, and were accompanied by a warranty that the defendant would honor. The court concluded that the defendant manufacturer's "conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." *Beverly Hills Fan Co.,* 21 F.3d at 1566. Likewise, in *Viam Corp. v. Iowa Export–Import Trading Co.,* 84 F.3d 424 (Fed.Cir.1996), a foreign defendant entered into an exclusive marketing and distribution agreement with an Iowa corporation that distributed its product throughout the United States and in the forum state of California. Beyond simply placing its product into the stream of commerce, the foreign corporation "knowingly and intentionally exploited the California market through its exclusive distributor's advertising in California, and by establishing channels for providing regular advice in California." *Viam Corp.,* 84 F.3d at 428–29.

In the instant case, Plaintiff has presented no evidence of additional conduct or contacts which would indicate that T & T purposefully directed its activities at the forum state of Pennsylvania. While T & T admits to a "general" awareness that its oven gaskets may be incorporated into ovens sold in various states, including Pennsylvania, it has no control over whether the gaskets end up in Pennsylvania as opposed to any other state, and has taken no purposeful steps to ensure that it reaps the benefits of Pennsylvania business. T & T does not ship its products to Pennsylvania. Unlike the defendant in *Viam Corp.,* T & T has no exclusive distribution agreement with Electrolux/Frigidaire, and T & T is by no means the only company that sells oven gaskets for incorporation into Frigidaire ovens. Electrolux/Frigidaire does not market or advertise T & T's oven gaskets, let alone identify them by name, as in *Beverly Hills Fan Co.,* given that each gasket is merely one minor component of a larger and independently functional product, the home oven. Plaintiff has offered no evidence to suggest that consumers purchasing Frigidaire ovens are aware that the oven's heat-sealing gaskets were originally sold by a Texas corporation. T & T does not provide consumers, either directly or indirectly, with a warranty for its products. Even if the purchaser of a Frigidaire oven were to

---

1. Although this Court is obligated to apply Federal Circuit law in this patent infringement action, we note that the Third Circuit has likewise declined to adopt a position with respect to this issue. *See Pennzoil Prods. Co. v. Colelli & Assocs.,* 149 F.3d 197, 207 n. 13 (3rd Cir.1998); *Renner v. Lanard Toys,* 33 F.3d 277, 283 (3rd Cir.1994); *but see Portella v. Life–Time Truck Prods., Inc.,* 127 F.Supp.2d 652, 658–59 (E.D.Pa.2000) (adopting Justice O'Connor's approach as the "best-reasoned" and most likely to be adopted by the current Supreme Court).

contact an authorized Frigidaire service provider in Pennsylvania for a replacement gasket, there is no evidence that T & T would be involved in the replacement process in any way. In sum, T & T has neither designed its product to target the needs of Pennsylvania consumers, nor established channels for providing regular advice to Pennsylvania customers, nor marketed its product to consumers either directly, or indirectly, through a distributor or sales agent. *See Asahi Metal Industry Co.*, 480 U.S. at 112, 107 S.Ct. 1026. Thus, T & T's contacts with the forum state of Pennsylvania are clearly inadequate to satisfy Justice O'Connor's test of "stream of commerce-plus." It is arguable, however, that T & T's placement of oven gaskets into the nationwide stream of commerce, combined with its general awareness of their final destination, might be sufficient to satisfy Justice Brennan's less exacting standard for minimum contacts.

Despite the absence of clear guidance from either the Federal or Third Circuits, this Court must take a position with respect to the resolution of the instant action. Accordingly, we find that a defendant does not "purposefully direct" his activities at a forum state merely by selling a component part to a nationwide distributor of home appliances with the awareness that appliances containing the defendant's product may ultimately be sold in the forum state. In keeping with the stream of commerce theory proposed by Justice O'Connor in *Asahi*, there must be some additional evidence of the defendant's purpose and intent to serve the forum state, such as state-specific marketing or design, the provision of customer support services, or an exclusive contractual relationship with a distributor in the forum state. The Supreme Court has held that "foreseeability alone" is not a sufficient benchmark for personal jurisdiction under the Due Process Clause, and we believe that adoption of the broad minimum contacts test enunciated by Justice Brennan in *Asahi* would run afoul of this prescription. *World–Wide Volkswagen Corp.*, 444 U.S. at 295, 100 S.Ct. 559; *see Portella v. Life–Time Truck Prods., Inc.*, 127 F.Supp.2d 652, 658–59 (E.D.Pa.2000).

As this Court's jurisdiction over Defendants T & T and Hight Jr. would be grounded on the mere foreseeability that T & T's oven gaskets might be incorporated into products ultimately sold in Pennsylvania, we decline to exercise it. Absent some other justification for the exercise of personal jurisdiction, this Court must dismiss the claims raised by Plaintiff against Defendants T & T and Hight Jr.

## II. Jurisdiction Under the Alter Ego or Successor Theories

Plaintiff contends that, even if Defendants T & T and Hight Jr. themselves had insufficient contacts with the forum state of Pennsylvania to satisfy the requirements of due process, this Court should nonetheless exercise jurisdiction because these Defendants are the alter egos or successors of H&M, a corporation with substantial and ongoing Pennsylvania contacts.

Where an individual or a corporation has insufficient contacts with the forum state to satisfy due process, a court may nonetheless exercise personal jurisdiction if the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction before that court. *Minn. Mining & Mfg. Co. v. Eco Chem*, 757 F.2d 1256, 1265 (Fed.Cir.1985) (citing *Lakota Girl Scout Council, Inc. v. Havey Fund–Raising Mgmt., Inc.*, 519 F.2d 634 (8th Cir.1975)). The alter ego and successor doctrines are closely related, and look to whether the later-formed entity is a mere continuation

of its predecessor, as well as whether there are any indicia of fraud, illegality, or injustice. *See generally, Material Supply Int'l, Inc. v. Sunmatch Indus. Co.,* 62 F.Supp.2d 13, 19–20 (D.D.C.1999); *Richard v. Bell Atl. Corp.,* 946 F.Supp. 54, 61 (D.D.C.1996). In making these determinations, the court should consider the nature of the corporate entities' ownership and control, including commonality of stockholders or officers; common use of employees, business locations, or sales systems; common marketing or trademarking; similarity of core business lines; and commingling of funds and assets. *See Lucas v. Gulf & Western Industries, Inc.,* 666 F.2d 800, 805–806 (3rd Cir.1981); *Gammino v. SBC Communs., Inc.,* 2005 WL 724130, \*\*3–4, 2005 U.S. Dist. LEXIS 5077 at 11–12 (E.D.Pa.2005); *Material Supply Int'l, Inc.,* 62 F.Supp.2d at 19–20. The court should also consider the sufficiency of consideration paid for the transfer of the predecessor's assets or product line, as well as any other indicia of fraudulent intent in the creation of the second entity. *Material Supply Int'l, Inc.,* 62 F.Supp.2d at 19–20; *Valley Finance v. United States,* 629 F.2d 162, 172 (D.C.Cir. 1980).

 In this action, Plaintiff has failed to show to this Court's satisfaction that Defendants T & T and Hight Jr. are true successors or alter egos of Defendant H&M. This Court does recognize that Defendant Hight Jr. is an officer, shareholder, and employee of both T & T and H&M, and that T & T's headquarters are located at the same address as one of H&M's offices. This Court further recognizes that Hight Jr., as T & T's agent, is currently in the business of selling the same allegedly infringing oven gaskets he once sold as an agent of H&M, and to at least one of the same customers. However, the jurisdictional discovery that has been conducted since this Court's last order reveals a credible explanation of why T & T and

Hight Jr. should not be considered successors or alter egos of H&M.

Hight Jr. owns only 5.6% of H&M's stock and does not participate significantly in the management, control, or day-to-day business decisions of H&M. (Flack Depo., pp. 112, 121; Hight Aff. ¶ 4). H&M and Hight Jr. both maintain that there is no corporate relationship whatsoever between H&M and T & T. (*Id.* at pp. 105–106; Hight Aff. ¶ 6). Nancy Flack, the president of H&M, avers that Hight Jr.'s 2004 creation of T & T resulted from a family rift concerning H&M's business line that occurred as early as October of 2003, at least three months before H&M was notified of a potential patent dispute. (*Id.* at pp. 30–37). H&M contends that the allegedly infringing gasket was designed by Hight Jr. and Sylvia Hight, and that H&M authorized Hight Jr. to make only two sales of sample gaskets on its behalf in 2003. (*Id.* at pp. 65–67, 82–84). Hight Sr. then determined that he was not interested in pursuing the oven gasket product line, and allegedly instructed Hight Jr. to stop purchasing and selling the gaskets on behalf of H&M. (*Id.* at pp. 33–37, 106–107, 114–115). H&M maintains that any invoices for gaskets issued after October 2003 were not authorized by H&M. (*Id.* at pp. 31–32, 74–78, 95). Furthermore, H&M makes no claims with respect to any patent rights for the product developed by Hight Jr. (*Id.* at pp. 108–109; Hight Aff. ¶ 11).

Plaintiff asserts that T & T was created for the purpose of shielding H&M from patent litigation. However, every allegedly incriminating fact identified by Plaintiff is adequately rebutted by Nancy Flack's description of the events at issue. While Plaintiff contends that the timing of T & T's formation suggests an attempt to shield H&M from liability, this Court finds credible Nancy Flack's description of the

October 2003 conflict between Hight Jr. and Hight Sr. with respect to H&M's sale of oven gaskets. And while Sylvia Hight's e-mails to the Chinese manufacturer may suggest an attempt by T & T to avoid liability for patent infringement, Plaintiff has offered no evidence beyond Sylvia Hight's use of an H&M e-mail address to suggest that H&M in any way authorized, or was even aware of, this course of action. Plaintiff also makes much of the fact that no consideration was paid by T & T to H&M for its gasket business, and that Hight Jr.'s gasket sales continued "seamlessly" through the transition from H&M to T & T. However, as H&M admits that Hight Jr. and Sylvia Hight developed the gaskets, and now denies having any claim to the product's patent rights, the course of events highlighted by Plaintiff seems less troubling. If Hight Jr. and Sylvia Hight initially introduced their gaskets as a potential H&M product line, and were informed that H&M was not interested in pursuing this line of business, it should come as no surprise that Hight Jr. would subsequently decide to sell his product through a corporation of his own creation. If H&M has no rights to the product at issue, it is likewise logical than no consideration would be paid for the transfer of H&M's "interest" in the product. Plaintiff's final piece of evidence suggesting a link between H&M and T & T is that Hight Sr. provided T & T with a $25,000 start-up loan. However, Plaintiff has offered nothing to suggest that this $25,000 was anything other than a legitimate family loan from a successful father to a son who is starting his own business. Moreover, Hight Jr. also contributed over $150,000 of his own money towards the formation of T & T, $65,960 of which was deposited in late 2003, long before H&M even knew of the possibility of a patent infringement action by Davlyn. (Pl.Exh. I).

The justification for imposing alter ego or successor jurisdiction is to prevent corporations from escaping liability by hiding behind sham entities. While the facts highlighted by Plaintiff tend to suggest that Hight Jr. was aware of the pending patent dispute when he incorporated T & T, Plaintiff has failed to set forth sufficient evidence demonstrating that H&M authorized or anticipated the creation of T & T, or had any expectation that T & T's formation would help H&M escape liability. In fact, the testimony of H&M's representative, Nancy Flack, indicates that Hight Sr., who owns 60% of H&M's stock, instructed Hight Jr. in October of 2003 not to make any additional purchases or sales of oven gaskets, either on H&M's behalf or on Hight Jr.'s own behalf. (Flack Depo., p. 34; Hight Aff. ¶ 4). Thus, Plaintiff's assertion that T & T was created for the purpose of shielding H&M from jurisdiction or liability is grounded in little more than speculation. This Court finds that Plaintiff has failed to meet its burden of demonstrating that personal jurisdiction over Defendants would be proper under a theory of alter ego or successor liability.

## III. Defendants' Motion in the Alternative to Transfer

As this Court finds that it cannot exercise jurisdiction over Defendants T & T and Hight Jr. consistent with the requirements of due process, the claims against them must be dismissed, and Defendants' motion in the alternative to transfer this case to the Western District of Texas is moot. Plaintiff's action against Defendant H&M may proceed before this Court, and Plaintiff is free to pursue its claims against Defendants T & T and Hight Jr. in a more appropriate forum.

An appropriate Order follows.

*ORDER*

AND NOW, this 18th day of August, 2005, upon consideration of the Renewed Motion to Dismiss, Or, In the Alternative, to Transfer of Defendants Tape & Technologies Incorporated and Henry C. Hight, Jr. (Doc. No. 35) and all responses thereto (Docs. No. 36, 37, 38), it is hereby ORDERED that the Motion is GRANTED. It is FURTHER ORDERED that this matter is DISMISSED as to Defendants Tape & Technologies Incorporated and Henry C. Hight, Jr. only.